449 F.2d 1209
 William Ernest DICKERSON et al., Plaintiffs-Appellees-Cross Appellants,
v.
CONTINENTAL OIL COMPANY et al., Defendants-Appellants-Cross
Appellees, and Charles N. Duddleston, d/b/a
Duddleston Welding Company, Defendant-Appellee,
HOUMA WELL SERVICE, INC. and Crown Petroleum Corporation,
Third-Party Defendants-Appellees.
 No. 30631.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 28, 1971.
Rehearings Granted In Part Dec. 1, 1971, Jan. 13, 1972.
Rehearing Denied Feb. 9, 1972.
 
 Fred H. Sievert, Jr., Lake Charles, La., Breard Snellings, New Orleans, La., for Continental Oil Co.; Stockwell, St. Dizier, Sievert & Viccellio, Lake Charles, La., of counsel.
 Samuel C. Gainsburgh, New Orleans, La., Leonard Fuhrer, Alexandria, La., Bob F. Wright, Lafayette, La., Louisiana Trial Lawyers Assn., amicus curiae.
 Wm. B. Baggett, Lake Charles, La., for William Ernest Dickerson; Baggett, Hawsey & McClain, Lake Charles, La., of counsel.
 Gilbert L. Dozier, Baton Rouge, La., for Doyle.
 John R. Martzell, Martzell & Montero, New Orleans, La., for Ruth Clark and Houma Well Service, Inc.
 Russell T. Tritico, Lake Charles, La., for D. Clark.
 Young & Burson, Eunice, La., for Guillory.
 Frank M. Brame, Lake Charles, La., for Lula Mae Taylor; Brame, Stewart & Bergstedt, Lake Charles, La., of counsel.
 Henry L. Yelverton, Lake Charles, La., for Dunham.
 Jones & Jones, Cameron, La., for Charles and Virginia Duddleston; J. B. Jones, Jr., Cameron, La., of counsel.
 Daniel J. McGee, Mamou, La., for Monk.
 Beeson & Beggs, Vidor, Tex., Payton R. Covington, Lake Charles, La., for Bishop.
 John B. Scofield, Thomas M. Bergstedt, Scofield & Bergstedt, Lake Charles, La., for Ins. Co. of North America.
 John G. Torian, II, J. J. Davidson, Jr., Davidson, Meaux, Onebane & Donohoe, V. Farley Sonnier, Lafayette, La., for Charles N. Duddleston d/b/a Duddleston Welding Co.
 Edgar F. Barnett, R. W. Farrar, Jr., for Houma Well Service, Inc. and Aetna Cas. and Sur. Co.; Hall, Raggio, Farrar & Barnett, Lake Charles, La., of counsel.
 Edward S. Bagley, Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for Crown Petroleum Corp.
 Before TUTTLE, WISDOM and INGRAHAM, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 This appeal, accurately described by the trial court as "a multiple donnybrook" in which theories of initial, contingent and secondary liabilities abound, arose out of an explosion and fire which occurred on February 3, 1967 on an offshore stationary (fixed) drilling platform located in the Gulf of Mexico, on the Outer Continental Shelf. Multiple suits for damages for wrongful deaths, personal injuries and property damage growing out of the explosion were filed. Before discussing the merits of these suits, it is necessary briefly to set forth the facts involved and, in so doing, to delineate the relationships of the multiple parties involved.
 
 I. FACTS
 
 2
 Prior to February 3, 1967, the date of the explosion, Houma Well Service, a drilling contractor under a written agreement with Continental Oil Company, the owner of the stationary platform involved, was drilling oil wells on the platform. The drilling rig utilized was owned by Houma, but prior to the accident, it was sold to Crown Petroleum Corporation.
 
 
 3
 On January 23, 1967, Continental hired an independent contractor to begin testing one of these wells. During these tests, water, gas and oil were produced. This product was run through a separator and thereby stripped of its liquids. These liquids, referred to as "condensate," were highly volatile and unstable. Though there were various methods of disposing of the condensate, Continental directed that it be poured into a white tank located on the northeast corner of the platform. This tank was normally used for storing diesel fuel, which is not highly volatile, and the record reveals that all those working in the general area thought the tank contained only diesel fuel. Indeed, prior to the explosion, condensate was never even stored on a drilling platform, much less in a "diesel" tank. The tank itself was not plugged and Continental's representative told no one that it contained condensate.
 
 
 4
 While this testing was proceeding Continental hired a contract welder, Duddleston, to do some work on a rack on which a Schlumberger unit was to be placed. Pursuant to this agreement, Jim Duddleston, son of the owner of the welding operations, reported to the platform. One Harvey Herrington also came aboard. He was to act as a tool pusher for the new owner of the rig, Crown Petroleum. On February 2nd, while testing was still in progress, Donald Ray Smith, the foreman for Continental and their only representative on the platform, called together both Herrington and Jim Duddleston to tell them they were to install the rack. Smith testified that this conversation occurred at about 7:00 a. m. on February 2nd. He also testified that later that morning-about 10:00 a. m.-he noticed that the four inch bull plug was not in the top of the white tank and asked Herrington to find it and put it on. He also said that he wanted no drilling done on the rack while the plug was missing, but never told anyone just what the tank contained nor how dangerous it really was. Smith also testified that at no time did he think that there would be cutting done with a cutting torch above the white tank. He left the platform around noon on February 3rd, leaving Herrington in charge. At about 3:45 that afternoon, while Duddleston was welding over the white tank, the explosion occurred. A bucket which one of Herrington's workers had placed over the hole, apparently disappeared and the trial court found that there was no covering over the hole from 11:30 a. m. until the time of the explosion.
 
 
 5
 All plaintiffs, except those in the Duddleston case, an entirely separate issue to be dealt with infra, named as original defendants, Continental Oil Company and Duddleston Welding Company. Continental has, in turn, filed third party demands and/or cross claims against Crown Petroleum Corporation, Insurance Company of North America, Duddleston and Houma Well Service, Inc. These parties have also cross-claimed but we will deal first with the issues raised by the original plaintiffs and defendants.
 
 
 6
 Of the six plaintiffs in this case, five-Joyce A. Clark, Esta Faye Bishop, Ruth Clark, Lula Mae Taylor, and Shirley Hester-are appealing from what they consider inadequate and erroneous damage awards for wrongful death; the sixth, William Ernest Dickerson, appeals from his award for personal injuries on the ground of inadequacy. In addition, while agreeing with the trial court's finding that the negligence of Donald Ray Smith, Continental's drilling foreman, was a proximate cause of the accident, they also maintain that the trial court erred in failing to impose liability on James Duddleston, the welder. They argue that welding over the open tank made him a joint tort feasor; it was a contributing cause to the explosion but was not such as to insulate Continental from liability. We will deal first with these latter contentions, and then examine the individual damage awards of the plaintiffs.
 
 II. APPLICABLE LAW
 
 7
 In Rodrigue v. Aetna Casualty and Surety Company, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360, the Supreme Court held that fixed platforms on the Outer Continental Shelf were "artificial islands." They were to be treated as federal enclaves within a state, and were to be governed by the Outer Continental Shelf Lands Act, 43 U.S.C.A. Sec. 1331 et seq., which incorporated and federalized the law of the adjacent state where not inconsistent with federal law.[1] In determining liability and the amount of damages to be awarded in this case the law of Louisiana thus applies.
 
 III. CONTINENTAL'S LIABILITY
 
 8
 We begin with the liability of Continental. The trial court found that the negligence of Continental was "clear, convincing and gross." Specifically Continental was negligent in the following particulars which proximately caused the explosion:
 
 
 9
 (a) In failing to provide safe storage for liquids and gases with highly volatile properties;
 
 
 10
 (b) In causing or permitting said liquids and gases to be stored in a tank which was being used for diesel fuel and liquids of less dangerous properties;(c) In permitting welding operations in an area containing an explosive atmosphere nearby;
 
 
 11
 (d) In failing to post signs and otherwise warn workmen that the storage tank contains highly volatile liquids and gases; and
 
 
 12
 (e) In storing condensate on board a platform at sea when safer alternatives were available.
 
 
 13
 We agree with these findings and the conclusion of the trial court.
 
 
 14
 It is Continental's view, however, that the trial court held it liable primarily on the basis of a failure to warn the plaintiffs that condensate had been placed in the tank and that it was highly volatile, This, they feel, was not a substantial cause of this accident, particularly when taken in connection with other facts found by the trial court. For example, it notes the finding that had the fourinch opening on the top of the tank been closed in a proper manner, the accident probably would not have occurred.
 
 
 15
 The Louisiana courts have generally defined proximate cause as being:
 
 
 16
 Any cause which is natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred; and from which it ought to have been foreseen or reasonably anticipated by a person of ordinary prudence in the exercise of ordinary care that the injury complained of, or some similar injury, would result therefrom as a natural and probable consequence. Sumrall v. Aetna Casualty and Surety Company, 124 So.2d 168, 176 (La.App.1960). See also, Ardoin v. Williams, 108 So.2d 817 (La.App.1959); Harvey v. Great American Indemnity Company, 110 So.2d 595 (La.App.1959).
 
 
 17
 Applying this standard to the case at bar, we have no trouble agreeing with the trial court's conclusion.
 
 
 18
 In addition to arguing that it was not liable, Continental also contends that the trial court erred in failing to find Duddleston also negligent, thereby at least making him a joint tort feasor and at best, an intervening cause insulating Continental from all liability. We have already dealt with Continental's liability and have concluded its negligence was a proximate cause of the accident. Regarding Duddleston, we again agree with the trial court and hold that he was not a joint tort feasor.
 
 
 19
 It is argued, however, that if Duddleston, who was cutting with his torch on a piece of pipe directly above the opening of the tank, had merely stepped down and checked its contents by smell, he would have realized that it contained condensate. It is also noted that he failed to place any wet sack or material beneath him to protect this area from fallen molten material. In addition, it is contended that the doctrine of Res Ipsa Loquitur applies and, in any event, that liability may be found under Article 2315 of the Louisiana Civil Code.
 
 
 20
 Once again, we agree with the conclusion of the trial court. Failure to check the tank below or take any extra precautions is excusable in light of the fact that everyone involved thought that only diesel fuel, a nonvolatile substance, was in the tank. Further, the record reveals that when Duddleston came aboard and began his job, the regular rig welder had already been working in that general area for six days. Finally, as emphasized above, no warning whatsoever was given regarding the contents of the white tank.
 
 
 21
 We also hold that the doctrine of Res Ipsa Loquitur does not apply. The trial court based its holding on Fidelity and Casualty of New York v. Funel, 383 F.2d 42 (5th Cir. 1967). Plaintiffs and Continental, however, argue that Moak v. Link Belt Company, 229 So.2d 395 (La.App.1969) compels a contrary result. We feel neither case applies.
 
 
 22
 As stated in Moak, supra, res ipsa loquitur simply means:
 
 
 23
 "That the circumstances involved in or connected with an accident are of such an unusual character as to justify, in the absence of other evidence bearing on the subject, the inference that the accident was due to the negligence of the one having control of the thing which caused the injury. This inference is not drawn merely because the thing speaks for itself, but because all of the circumstances surrounding the accident are of such a character that, unless an explanation can be given, the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty." Id. at 406.
 
 
 24
 The res ipsa argument advanced in this case is that Duddleston was in control of a dangerous instrumentality, a welding torch, and that he was using it over an open tank. This does not fit the res ipsa doctrine outlined above. "The thing which caused the injury" was the open tank. This was the dangerous instrumentality involved in the accident, not the torch. Duddleston had no control over it and no knowledge whatsoever as to its explosive contents. Further the circumstances of this accident are not of such a character that "the only fair and reasonable conclusion is that the accident was due to some omission of the defendant's duty." We have already delineated what we feel to have been the proximate cause of this tragic event. The fact that Duddleston innocently lit the fuse of Continental's unmarked time bomb does not invoke the doctrine of res ipsa loquitur, nor does it impose liability upon him.
 
 
 25
 It is also argued that Duddleston is liable under Article 2317 of the Louisiana Civil Code.[2] Regarding this point, we agree with the reasoning of the trial court. Article 2317 does not impose absolute liability for damages caused by one's property, but rather a refutable presumption of negligence. Dupre v. Travelers Insurance Company, 213 So.2d 98 (La.App.1968). In effect, it may be equated with res ipsa loquitur. In so doing, we reach, of course, the same conclusion as stated above.
 
 IV. DAMAGE CLAIMS
 
 26
 Each plaintiff argues that the amount he or she received in damages is insufficient. Before examining the individual claims of the plaintiffs, we will first deal with an issue common to all.
 
 
 27
 It is argued that in fixing the awards, the trial court did not act independently, but rather seemed constrained by Louisiana jurisprudence in that it seemed bound by a system of "standard or uniform awards." Though little monetary distinction was made between the widows and surviving children, we do not feel that this was due to the fact that the trial judge was failing to exercise his discretion, or indeed, that he felt constrained by Louisiana jurisprudence. The trial court explicitly stated:
 
 
 28
 Damages in cases such as this cannot be computed by mathematical formulae nor derived from fixed principles susceptible, of being programmed into a computer * * * The simple truth is that there are too many variables. None of us can devine the future. Here, we are governed by Louisiana. The Supreme Court of that state had categorically rejected the use of mathematical formulae in awarding damages. McFarland v. Illinois Central Railroad [241 La. 15], 127 So.2d 183; Pennington v. Justiss-Mears Oil Company [242 La. 1], 134 So.2d 59. The amount to be fixed in each case calls for the independent judgment of an independent judge. (emphasis added).
 
 
 29
 The fact that the trial judge was aware of this leads us to the conclusion that even though some of the awards were similar, they were, nonetheless, arrived at by the exercise of the court's discretion.
 
 
 30
 We now examine the individual claims of the plaintiffs.
 
 
 31
 (a) Joyce A. Clark. Mrs. Clark received a total of $146,521. It was itemized in three items: 1. For the loss of support, contributions, or, as sometimes stated, pecuniary loss for Mrs. Clark and her three children; 2. for the loss of society, love and companionship of deceased and anguish of beneficiaries, (i. e., Mrs. Clark and the same three children); 3. funeral expenses.
 
 
 32
 Although Mrs. Clark claimed an item of pain and suffering of the deceased prior to his death, the trial court made no finding with respect to whether such pain and suffering was actually experienced by Mr. Clark, and included no item of pain and suffering in the aggregate arrived at in favor of Mrs. Clark.
 
 
 33
 With respect to the claim of Mrs. Lulu Mae Taylor, whose husband also died, the trial court itemized the damages in the same manner as in the Clark case, but it also added an item for "conscious pain and suffering of decedent prior to his death," amounting to $10,000.
 
 
 34
 In the cases of persons who filed claims for personal injuries, but who were not killed, the trial court made plain in each instance that the aggregate sum allowed included all elements of injury, including pain and suffering. It seems, therefore, to be apparent that had the trial court intended to make an allowance for Mrs. Clark with respect to pain and suffering of her husband during the short time before he died, it would have done so as a separate item and would not have lumped it into any of the other items constituting the award. Mrs. Clark claims that under the Louisiana cases the element of pain and suffering must be expressly itemized in a finding of fact. See Hall v. State through Department of Highways, 213 So.2d 169 (La.App. 3 Cir., 1968), and also contends that this is required by Federal Rules of Civil Procedure 52(a).
 
 
 35
 Whether or not the Federal rule requires a separate itemization (it is the Federal Rules that would apply to the matter of findings by a trial court in this federal trial), it seems clear to us that the trial court simply failed to make a finding with respect to a claimed item and with respect to which there was some evidence. We are, therefore, without the guidance of the trial court's determination as to whether the evidence warranted the making of such an award.
 
 
 36
 The essential facts concerning what happened to the decedent are not in dispute. At the time of the explosion he went overboard and into the ocean. The coroner testified that death was from drowning, and in response to the inquiry as to "interval between onset and death" he had entered the notation "immediate." He had second and third degree burns of the face. The coroner testified in response to question from appellant's counsel as to what he meant by "immediate," as follows: "Immediate from asphyxiation from drowning would mean that the time actually it would take him to drown, which could be of varying period of time, from five to ten minutes." The following question and answer then followed:
 
 
 37
 "Doctor, if we assume that both of these gentlemen had sustained burns while on a stationary platform and that subsequently they were found in the water, and their cause of death was found to be drawing, would it be probable, sir, that they, from a medical standpoint, that they experienced pain and suffering prior to their death?
 
 
 38
 A They would have some, yes."
 
 
 39
 Although it does not appear from the record that the decedent was conscious while in the water, neither does it appear that he was unconscious. If the former, then it must be without dispute that he did suffer some pain, not only from the burns but also from the anguish of struggling against drowning. See Hall v. State through Department of Highways, supra.
 
 
 40
 Upon remand, the court should make findings with respect to whether, on the undisputed facts of this case, the judgment in favor of Mrs. Clark should include an award for pain and suffering.
 
 
 41
 (b) Shirley Hester. Mrs. Hester received a total of $91,623.40. She too argues that a finding regarding the pain and suffering endured by her husband prior to his death should have been made. Since her situation is precisely the same as Mrs. Joyce Clark's, we reverse this portion of the case for further consideration by the trial court.
 
 
 42
 In addition, it is also argued that Mrs. Hester's award for "loss of support" is unduly low. It is felt that she and her children were penalized and the only thing of record that could account for this was the fact that in July, 1965 she and her husband had been informally separated. She argues that though the marriage was "stormy" at the outset, it had developed into a harmonious marriage.
 
 
 43
 We do not doubt that a reconciliation took place, but in putting money values on essentially priceless relationships, no hard and fast rules can apply. Since we feel there has been no abuse of discretion on the part of the trial court, we affirm this part of the award. See, Neal v. Saga Shipping Company, 407 F.2d 481 (5th Cir. 1962); Ohio Barge Line, Inc. v. Oil Transport Company, 280 F.2d 448 (5 Cir. 1960).
 
 
 44
 (c) Esta Faye Bishop. Mrs. Bishop received a total award of $95,919.95. She too argues that, because of Mr. Bishop's fine character, good job and the happy, and successful marriage they had, she should have been awarded a larger sum for the death of her husband. For the reasons stated above, we affirm the judgment of the trial court.
 
 
 45
 Mrs. Bishop also argues that recovery should have been allowed for the five children in their family. Mr. Bishop had two children by his first marriage but both were grown and not dependent upon him for support at the time of the filing of the claim. Subsequent to filing this claim, Rodrique was decided which, plaintiff contends, by making Louisiana law applicable, gave these two children a claim. A motion was filed to amend the complaint, but it was denied by the trial court as having been filed more than a year after the death and thus beyond the Louisiana prescription date. It is argued that Huson v. Chevron Oil Co. v. Otis Engineering Corporation, 430 F.2d 27 (5th Cir. 1970) compels a different result. We disagree. This case specifically states that "unlike death actions for which Art. 2315 prescribes both the right and time, nondeath rights created by Art. 2315 find their time restrictions in Art. 3536." Because of this, the court held that the one year limit did not apply to nondeath rights. Here, we deal with a claim made under Article 2315 for wrongful death. The one year limit thus applies.
 
 
 46
 It is also contended that three minor children of a former marriage of Mrs. Bishop ought to recover. These children, however, were not adopted by Mr. Bishop. We feel compelled to agree with the trial court.
 
 
 47
 "It is true that the Supreme Court of the United States in Levy v. Louisiana, 391 U.S. 68 [88 S.Ct. 1509, 20 L.Ed.2d 436], faulted the Louisiana courts for holding that the word 'child' in Article 2315 meant 'legitimate' child. The Supreme Court conceded that Louisiana had a broad power to make classifications, but emphasized that it had no right to draw a line which constituted an invidious discrimination against a particular class. It was, added the Court, invidious discrimination to construe the word child so as to deny recovery under Article 2315 by illegitimate children. This cases is not Levy. Here, there is neither a biological nor legal relationship between Mrs. Bishop's children and the deceased. These children do not fit within the classes of persons to whom Louisiana has accorded a right of action for death of another."
 
 
 48
 (d) Mrs. Ruth Clark. Mrs. Clark also argues that amendment of her complaint to include her two major children should have been allowed. For the reasons stated above, we disagree. She also contends that the trial court did not properly apply the law to the evidence in awarding pecuniary loss and loss of love, affection and companionship. Again, not finding that this award was clearly erroneous, we affirm its judgment.
 
 
 49
 (e) Lula Mae Taylor. Mrs. Taylor attacks only the adequacy of the award of the trial court to her and her five year old son. She was awarded $140,791.25. As with the other plaintiffs, we do not feel the trial court abused its discretion and therefore, affirm.
 
 
 50
 (f) William Ernest Dickerson. Dickerson argues that the $50,000 award he received for the personal injuries he sustained was inadequate. Though the award may be on the conservative side, we cannot find it to be clearly erroneous.
 
 
 51
 Intervention of Insurance Company of North America
 
 
 52
 Since, as noted above, Crown Petroleum Corporation purchased the drilling rig involved prior to the explosion, it was the statutory employer of most of the employees whose deaths or injuries precipitated this litigation. INA was the insurance carrier for Crown covering all risk to the drilling rig. As stated by the trial court:
 
 
 53
 "The rig was appraised as having a 'sound insurable value' of $421,873. After the fire, the rig was sold back to Crown for salvage of $60,000. INA paid on the face amount of its policy $402,000 plus $3,000 sue and labor charges. Deducting the salvage, INA claims a net loss of $345,000. By virtue of its payment of $345,000 to Crown, INA is legally subrogated to all of the rights which its insured had against Continental."
 
 
 54
 INA thus brought suit against Continental and Duddleston to recover the $345,000. The trial court, however, denied his claim on the grounds of the contributory negligence of the Crown tool pusher, Herrington. Although Crown was not made a defendant in the suits brought by its employees and the representatives of its deceased employees, this holding, INA argues, coupled with the holding that Rodrigue demanded application of the doctrine of contributory negligence, defeated their damage claim against Continental in its entirety. Thus, at issue is whether Rodrigue compels application of this doctrine and if so, whether Herrington was negligent.
 
 V. RODRIGUE v. AETNA CASUALTY COMPANY
 
 55
 Rodrigue involved the death of two men who were killed while working on artificial island drilling rigs located on the Continental Shelf more than a marine league from the Louisiana coast. Suit was brought under the Death on the High Seas Act and under Louisiana law which, it was argued, was made applicable by the Outer Continental Shelf Lands Act. The District and Appellate Courts held that the Seas Act was the exclusive remedy. The Supreme Court reversed, stating:
 
 
 56
 "The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as those in question hereon the outer Continental Shelf. That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law, is made clear by the language of the Act. * * *
 
 
 57
 ******
 
 
 58
 * * *
 
 
 59
 However, for federal law to oust adopted state law federal law must first apply. The court below assumed the Seas Act did apply, since the island was located more than a marine league off the Louisiana coast. But that is not enough to make the Seas Act applicable. The Act redresses only those deaths stemming from wrongful actions or omissions 'occurring on the high seas,' and these cases involve a series of events on artificial islands. Moreover, the islands were not erected primarily as navigational aids, and the accidents here bore no relation to any such function. Admiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea. To the extent that it has been applied to fixed structures completely surrounded by water, this has usually involved collision with a ship and has been explained by the use of the structure solely or principally as a navigational aid. But when the damage is caused by a vessel admittedly in admiralty jurisdiction, the Admiralty Extension Act would now make available the admiralty remedy in any event.
 
 
 60
 The accidents in question here involved no collision with a vessel, and the structures were not navigational aids. They were islands, albeit artificial ones, it was an island albeit an artificial one and the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers."
 
 
 61
 We feel Rodrigue compels the application of Louisiana's doctrine of contributory negligence in this case. Though maritime law utilizes a doctrine of comparative negligence, the events in question here, as in Rodrigue, all occurred on the platform. As the Supreme Court stated, "for federal law to oust adopted state law federal law must first apply." Since that court has decided that accidents which occur on such platforms have "no more connection with the ordinary stuff of admiralty than do accidents on piers," we are compelled to agree that Louisiana law applies.[3]
 
 VI. HERRINGTON'S NEGLIGENCE
 
 62
 We now turn to the alleged contributory negligence of Crown employee, Herrington. The trial court found Herrington negligent in the following particulars:
 
 
 63
 (a) In failing to properly supervise the work that was being done at the time of the fire and explosion;
 
 
 64
 (b) In failing to cover the four-inch opening when he knew that welding was to be performed over it and when he knew or should have known that condensate was in the tank. For Herrington to permit welding above the tank without having a plug put in the four-inch hole, as he had told Smith, the Continental pusher, that he, Herrington, would do, and then not to make sure that it was done is negligence of the grossest kind.
 
 
 65
 INA, however, argues that the trial court's conclusion that Herrington "knew or should have known" there was condensate in the tank cannot be justified. They note that Smith, Continental's toolpusher, testified that he told no one that condensate was in the tank. They also contend that the trial court's exclusion of evidence attempting to prove that Herrington, in fact, thought that only diesel fuel was in the tank was erroneous and, in short, reversible error. Finally, they contend that Herrington was the borrowed servant of Continental and even if he were negligent, that negligence ought to be imputed to Continental.
 
 
 66
 We do not feel that even assuming that Herrington thought that only diesel fuel was in the tank, that that fact alone exonerates him from fault. Smith not only specifically directed him to find a bull plug for the tank, but warned that he wanted no welding done in that area until one was found. Surely, this should have alerted Herrington that at least the possibility of danger existed or, in other words, that something other than diesel fuel may have been in the tank. Further, Herrington was left in charge of the platform. He was being depended upon by Smith to take care of the tank. He assumed this responsibility and regardless of his knowledge of its contents, the fact he failed to carry out this duty was negligence[4] which, we find, proximately contributed to the tragedy that occurred.
 
 
 67
 INA also argues that even if Herrington is found to be negligent, this negligence should be imputed to Continental. The trial court, however, found that:
 
 
 68
 "* * * Herrington, the tool pusher for Crown, was in charge at the time of the explosion. He was in the course and scope of his employment with Crown pursuant to Houma's contract with Continental."
 
 
 69
 We feel there is sufficient evidence to support this finding. Here the matter rests.
 
 
 70
 Having dealt with the issues raised by the original plaintiffs and defendants in this suit, as well as the intervention of INA, we now turn to the cross claims.
 
 
 71
 VII. CONTINENTAL v. HOUMA WELL SERVICE and AETNA
 
 
 72
 Houma Well Service and its insurer, Aetna, are third party defendants. Continental filed a third party complaint against Houma, seeking indemnification for any sums which Continental might be liable for. The basis of this claim is found in the indemnity provisions of the drilling contract between Continental and Houma, which was signed on August 15, 1966. Houma argues that it should not be held to this agreement since it sold its rig on January 24, 1967 to Crown. It is contended that this sale was, in effect, a novation which relieved Houma of its contractual obligations with Continental. Thus, these obligations were taken over by Crown, all with the knowledge and assent of Continental.
 
 
 73
 The trial court found to the contrary and we agree:
 
 
 74
 "There is considerable factual dispute as to the relationship of Houma and Crown, but no formal notice of the sale of the rig was ever given to any authorized official of Continental, and never was there any written notice of any kind to Continental, either by Houma or Crown. Nor was there any written assignment of the contract so as to relieve Houma of its liability, as called for by Article 16 of the contract."
 
 
 75
 Houma also argues, however, that even if the indemnification agreement is in effect, its pertinent provisions are invalid for they are against public policy. Paragraph 15 of the agreement states that Continental is to be indemnified against any and all claims of any employee of Houma, even though the claim is occasioned by the negligence of Continental.[5] In Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), the Supreme Court, in dealing with the problem of whether a towboat could validly contract against all liability for its own negligent towage, held that such contracts were against public policy. In Dixilyn Drilling Corp. v. Crescent Towing and Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), the court, relying on Bisso, struck down a similar contractual provision. Both these cases, however, deal with towage contracts which clearly are within the realm of federal maritime jurisdiction. The indemnity agreement in this case, however, is similar to the welder's contract in Grigsby v. Coastal Marine Service of Tex., Inc., 412 F.2d 1011. In that case, this court stated:
 
 
 76
 "Probably at this point the admiralty Judge must forsake his amphibious woolsack (citations omitted), and return to that less expansive function of Erie-seeking Louisiana law. The contract is not maritime and if it were, this aspect seems more like insurance and now much latitude is left to the states even as to maritime insurance (citations omitted). Thus this Louisiana-trained Judge was faced with the problem of Louisiana policy considerations on indemnity contracts indemnifying one against his own negligence."
 
 
 77
 Thus, in applying the law of Louisiana, we are in accord with the Outer Continental Shelf Act. Since this is clearly a state matter, we are not, in so doing, acting in a manner which is inconsistent with any established federal law on this subject.
 
 
 78
 Louisiana law is clear. Provided that the particular provisions in question clearly express the desire to indemnify even though an accident occurs through the negligence of the indemnitee, Mills v. Fidelity and Casualty Co., 226 F.Supp. 786 (W.D.La.1964), which we find to be the case here, a Louisiana Court has held:
 
 
 79
 "We find no possible violation of public policy in the application of the indemnity agreement in the instant case. To hold that a party cannot protect itself through indemnification or insurance against liability for its own negligent acts would not only do violence to well established authority to the contrary but would strip vast numbers of the protection accorded by such contracts." Jennings v. Ralston Purina Company, La.App., 201 So.2d 168.
 
 
 80
 Houma also argues that the indemnity contract did not apply to the facts of this case. They contend that the contract was designed to cover only work which Houma was obligated to perform under its drilling contract, and that none of the work in connection with the alleged accident was a part of the work to be performed by Houma. The trial court, however, noted the following phraseology:
 
 
 81
 "* * * in any wise arising out of or incident to the work to be performed under this contract."
 
 
 82
 It went on to find that the contract provided work to be done in connection with the drilling and completion of wells. Further, this court noted:
 
 
 83
 The indemnification agreement did not say that it covered only work that was to be done by the contractor, but rather incident to or growing out of the work done under the contract. All of the work on the platform at the time of the fire was work arising out of or incident to this contract, including the tying in of the Schlumberger rack to the drilling rig which was situated on the platform. (emphasis added)
 
 
 84
 We agree with this interpretation.
 
 
 85
 Finally, Continental argues that the trial court erred in limiting Houma's liability to the amount of the contractually required coverage, $300,000. We agree with the conclusion of the trial court. Section IV, subsection 10(b) of the agreement dealing with the contractual insurance coverage clearly states:
 
 
 86
 Comprehensible (sic) General Liability Insurance with Bodily Injury limits of not less than $100,000 for one person and $300,000 for any one accident, and with a property damage limit of not less than $25,000 for each accident. Such policy shall be written to cover all obligations imposed by Article VI of this contract, and to include coverage for surface damage from blowout and cratering.
 
 
 87
 We feel this clearly stated the limits of Houma's liability.
 
 VIII. THE CLAIMS AGAINST CROWN
 
 88
 Houma contends that if it is required to indemnify Continental, it should be entitled to a like indemnification from its assignee, Crown. Thus, the issue presented is whether, upon purchase of the drilling rig from Houma, Crown assumed the indemnity agreement between Houma and Continental. The trial court made the following findings of fact:
 
 
 89
 (1) Houma prepared the 15 page contract dealing with the sale of the rig which made no mention of the indemnity agreement.
 
 
 90
 (2) Houma did not furnish a copy of the drilling contract or the indemnity provision to Crown or make any reference to it whatever in the entire course of its negotiations with Crown.
 
 
 91
 (3) Mr. H. Martin of Houma did not know whether Houma "would negotiate a new contract with Continental or whether they would just take over the contract that I had.
 
 
 92
 (4) The only element of the Continental/Houma contract which H. Martin brought to the attention of Crown was the requirement that an assignment be in writing.
 
 
 93
 (5) No such assignment was made.
 
 
 94
 (6) Houma maintained its insurance coverage on the rig with Aetna.
 
 
 95
 The trial court concluded that the indemnity claims against Crown were without merit. In light of the above findings of fact which we do not find to be clearly erroneous, we agree.
 
 IX. MR. and MRS. DUDDLESTON
 
 96
 The Duddlestons brought suit for the wrongful death of their son, James. Both were awarded $20,000 together with funeral bills in the sum of $3,264.95 in favor of Mr. Duddleston as the administrator of the estate of his son. The trial court, however, nullified the award to Mr. Duddleston as well as the funeral bill to Duddleston, in his capacity as administrator of his son's succession, on a "confusion" doctrine that arose out of an indemnity agreement executed by Duddleston and Continental Oil Company. In the words of the trial court:
 
 
 97
 "Continental insists that Duddleston's agreement to indemnify Continental resulted in uniting the quality of both debtor and creditor in the same person, thereby causing a confusion of rights which extinguished the obligations. We agree. The qualities of debtor and creditor became united in Duddleston, and under the clear wording of the Louisiana Civil Code there arose "a confusion of right which extinguishes the obligation." La.Civil Code Act 2217 (1870). The 'generality of the language of the Code indicates, that donation prescription, or any other method of acquisition of the two sides of an obligation by the same person, will extinguish the obligation by confusion.' Comment, 36 Tulane Law Review 521, 523 (1962). Thus, 'the manner in which the same person becomes the creditor and debtor of an obligation is immaterial."' Id.
 
 
 98
 Duddleston, relying on Dumas v. United States Fidelity and Guaranty Company, 241 La. 1096, 134 So.2d 45, argues that Article 2217 does not apply. There is no uniting of the relationship of debtor and creditor. Continental is the principal debtor and Duddleston is the creditor. However, the trial court failed to adopt this view for, by reason of the indemnity agreement, Duddleston had expressly made himself a debtor of Continental. We agree.
 
 X. CONCLUSION
 
 99
 We have carefully reviewed this record and considered the claims of the twelve claimants, cross-claimants and third party claimants. We conclude that with the exception of the noted failure of the trial court to make findings as to pain and suffering of Clark and Hester and giving effect to such findings the judgment must in all things be affirmed.
 
 ON PETITIONS FOR REHEARING
 PER CURIAM:
 
 100
 Upon consideration of the several petitions for rehearing in this case, the court considers they should all be denied with the following exception: it appears, without contradiction by the other parties, that the facts of the claim of Mrs. Esta Faye Bishop dealing with alleged pain and suffering of her deceased husband is identical with the cases of Mrs. Joyce A. Clark and Mrs. Shireey Hester, as to which the case has been remanded to the trial court for a limited determination as to pain and suffering. This being so, although the point was not raised on Mrs. Bishop's behalf in the briefs before us, we conclude that the same disposition should be made of Mrs. Bishop's claim for pain and suffering as was made in our original opinion with respect to the claims of Mrs. Clark and Mrs. Hester. In all other respects the petitions for rehearing are denied.
 
 ON SECOND PETITION FOR REHEARING
 PER CURIAM:
 
 101
 Upon consideration of the second petition for rehearing filed by Mrs. Ruth Clark and Mrs. Esta Faye Bishop, this court concludes that, on the basis of the recent Supreme Court decision in Chevron Oil Company v. Huson, 1971, 404 U.S. -, 92 S.Ct. 349, 30 L.Ed.2d 296 it should be granted. Since Chevron holds that Rodrigue v. Aetna Casualty and Surety Company, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 is not to be applied retroactively in determining whether the state statute of limitations has run, we thereby remand for a determination by the trial court whether the admiralty doctrine of laches would bar the additional claims of these movants. The earlier order denying rehearing is hereby modified accordingly.
 
 
 
 [1]
 Section 1333 provides:
 "(a) (1) The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the Outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purposes of exploring for, developing, removing, and transporting resources therefrom, to the same extent as if the Outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.
 (2) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State as of August 7, 1953 are declared to be the law of the United States for that portion of the subsoil and seabed of the Outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the Outer Continental Shelf."
 43 U.S.C.A. Sec. 1333.
 
 
 [2]
 Article 2317 provides:
 "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."
 
 
 [3]
 This Circuit has dealt with the application of this case in two recent decisions. In Continental Oil Co. v. London Steam Ship Own. Mut. Ins. Ass'n, 417 F.2d 1030 (5th Cir. 1969) the court held that Rodrigue did not require the application of state law for the damage involved was caused by a collision of the vessel with the platform. This was clearly a case in which the Admiralty Extension Act applied. There being a fully effective maritime right and remedy, the application of state law was unnecessary. As this court noted, the recurring theme of Rodrigue was that state law would be applied only when necessary to fill a significant void or gap in the federal law
 In Huson v. Chevron Oil Co. v. Otis Engineering Corporation, 430 F.2d 27 (5th Cir. 1970), this court once again applied federal law. Noting that the statute of limitations for non-death cases in Louisiana is found in Louisiana Art. 3536 while the right to bring such an action is found in Louisiana Art. 2315, the Court concluded that "Art. 3536 is a procedural restraint which bars the remedy, but does not extinguish the right." While recognizing that state statutes of limitations are often applied in such situations, the Court voted that such limitations have been rejected when a significant federal interest made them inappropriate. "Never has this been more evident than in the maritime and quasi maritime area which is traditionally inbued with the laches doctrine and which presents a strong federal urge toward uniformity." Huson at 32. Thus, the court went on to hold that the federal doctrine of laches applies.
 Though it is argued that these cases should have a bearing on the case at bar, we feel that for the reasons stated above, this case comes clearly under the Rodrigue decision. Moreover, it should be noted that the Supreme Court has granted certiorari in Huson, 402 U.S. 942, 91 S.Ct. 1608, 29 L.Ed.2d 109.
 
 
 [4]
 The Trial Court found:
 The evidence reveals further that Herrington contrary to what he told Smith, apparently did not look for a plug, but called on the driller, Fregia, to put a bucket over the four-inch opening. Fregia testified that he was told to do this on the morning of the fire. Actually, the person who put a bucket over the four-inch opening was Claude Blanchard, who was told to do so by Fregia. He said that he used a piece of iron to hold down the bucket because the wind would blow it off. Some way, it did disappear and we find there was no covering over the hole from 11:30 a. m. until the time of the explosion.
 
 
 [5]
 "Contractor agrees to indemnity and hold harmless Company, * * * against any and all claims, demands or suits * * * which may be brought against Company * * * by any employee of Contractor of the legal representative or successor of such employee in anywise arising out of or incident to the work to be performed under this contract * * * and even though occasioned, brought about, or caused in whole or in part by the negligence of Company, its agents * * *."