436 So.2d 1245 (1983)
Delton H. CASON
v.
DIAMOND M DRILLING COMPANY, et al.
No. 82 CA 0638.
Court of Appeal of Louisiana, First Circuit.
June 28, 1983.
Rehearing Denied September 7, 1983.
Writ Denied November 18, 1983.
*1246 William B. Baggett, Baggett, McCall, Singleton, Ranier & Ieyoub, Lake Charles, for plaintiff.
Joseph J. Weigand, Jr., Weigand & Siegrist, Houma, for Diamond M Drilling Co., defendant and third party plaintiff.
Randall Theunissen, Allen Gooch & Bourgeois, Lafayette, for Union Oil Co., defendant and third party plaintiff.
*1247 Before EDWARDS, WATKINS and SHORTESS, JJ.
WATKINS, Judge.
This is a personal injury action brought by Delton H. Cason against Diamond M Drilling Company and Union Oil Company of California for injuries sustained by Cason when a well guide or templet on which Cason was engaged in welding fell into the Gulf of Mexico from a jackup rig, Diamond M 99. Diamond M had drilled a well from the rig, which was in the process of being plugged and abandoned. Cason was on the well guide cutting gussets with a welding torch, carrying out his duties as a maintenance welder employed by Diamond M, when the well guide fell into the Gulf. Union Oil owned the well guide and gussets, as well as the drive shaft to which the gussets were attached.
Union Oil filed a third party demand against Diamond M, seeking indemnification under a contract allegedly providing for indemnity, if Union Oil was found liable.
Suit was originally filed in Cameron Parish. The case was transferred to St. Mary Parish before trial after the filing of an exception of improper venue by Diamond M. Thereafter, Diamond M again filed an exception of improper venue,[1] and Union Oil filed an exception of lack of jurisdiction over the subject matter, as the rig upon which the accident had occurred had been located near Texas territorial waters off High Island, Texas. Also, exceptions of prescription or laches were filed by both defendants. All exceptions were overruled and the case proceeded to trial on the merits, which took place before a jury on all issues, except indemnity. The sole basis for possible liability of Diamond M was under the Jones Act (as Cason's employer) and the sole basis for possible liability of Union Oil was under the general maritime law of negligence.
The jury returned a verdict finding Cason 10% negligent, and "using 100% as the total amount of negligence by the defendants" found Diamond M 60% negligent and Union Oil 40% negligent. Total damages to plaintiff were assessed by the jury in the amount of $493,000.00. Union Oil and Diamond M filed motions for a new trial or remittitur. Only Union Oil was granted a new trial, which was limited to the question of the liability of Union Oil. A new trial was held before a separate jury on this issue, which found Union Oil not negligent under the general maritime law, and hence not liable. The trial court, based upon the jury's finding of 10% comparative negligence on the part of Cason, rendered judgment in favor of Cason and against Diamond M in the sum of $443,700.00. From the judgment Diamond M and Cason appealed. We affirm in part and reverse in part.

FACTS
Cason, who was previously employed as a bench welder and as a logger, had only a high school education. At the time of the accident, he was in his early thirties, and was employed as a maintenance welder.
The rig on which Cason was employed was owned by Diamond M, which as an independent contractor had undertaken to drill the well in question for Union Oil by modification of a prior agreement to drill a well in a different location (at Main Pass) for Mobil Oil. A Union Oil representative was on the rig, Dennis Romero, who was a graduate petroleum engineer, and who had general supervision over the tool pusher, Ken Smith. Romero testified at both the original trial and the new trial, but Smith could not be located to testify.
Diamond M had drilled a well for Union Oil from the rig in question, which operated from a movable drilling barge with jackup legs. The well was being plugged and abandoned. On the date of the accident on or about December 31, 1977, the well guide, which was used to guide the drive shaft, had been lifted from the ocean floor. The *1248 well guide was a 5 or 6 ton steel girder box which was held up, once lifted from the water, by gussets attached to the drive shaft both at the top and bottom of the box-like well guide. It was necessary to cut the gussets to salvage the well guide, which, as we have said, belonged to Union Oil. Cason, the maintenance welder, and a worker named Stelly, were assigned the task of cutting the gussets.
Smith explained the procedure to Romero. Romero had no experience in retrieving well guides, although he had had several years practical experience in working on drilling rigs. After hearing Smith's explanation, Romero agreed to the procedure. The bottom gussets were to be cut first. The well guide was to have a secondary support from two air hoists, the lines of which ran near the edge of the Texas Deck, which lay immediately below the drilling deck.
When Cason was assigned the task of cutting the gussets, he expressed apprehension to both Smith and Romero, but Smith assured him the procedure was safe. Cason was lowered to the well guide.
The air hoist lines if left taut would brush the sides of the Texas Deck. For this reason the lines were left slack until pads could be placed at the ends of the Texas Deck to cover the sharp edges of the deck. Although Romero was on the Texas Deck for about ten minutes, he failed to observe that the lines were not taut.
Cason started to cut the bottom gussets, and while he was in the act of cutting the last bottom gusset, the gussets on the top or the supports leading from the top gussets to the well guide gave way, and the entire weight of the well guide fell on the air hoist lines, which also gave way because they were slack. The well guide plummeted to the Gulf, which was about 30 or 40 feet below, carrying Cason and Stelly.
Cason blacked out momentarily while he was falling, but after going beneath the surface of the Gulf, to a considerable depth, rose to the surface. Both Cason and Stelly were saved.
Cason suffered a compression fracture of the first and second lumbar vertebrae. He also suffered a burst ear drum. He was taken to John Sealy Hospital in Galveston, and then placed under the care of Dr. Don H. Burt, an orthopedic surgeon in Shreveport. Following Dr. Burt's advice, Cason attempted to return to work, but had to stop working after a short time because of intense pain, which was caused by assuming awkward positions while welding. Cason thereupon started logging with his father, at a considerable reduction in wages. He appears to have been engaged in logging up to the time of the trial.
The appeals raise practically the entire range of issues considered by the trial court, including the exceptions.

EXCEPTIONS
The present action seeking recovery under the Jones Act and general maritime law is brought under the "saving to suitors" clause of 28 U.S.C. § 1333, which saves to suitors, bringing an in personam claim seeking relief under the laws of admiralty, a remedy in a "common law" (i.e., non-admiralty) court. In an action brought in state court under the "saving to suitors" clause, federal substantive law applies, but where the result is not substantially affected, the procedural law of the forum applies. Lavergne v. Western Co. of North America, Inc., 371 So.2d 807 (La.1979), Gilmore and Black on Admiralty, §§ 1-13 (2d ed. 1975). As the forum is the District Court of Louisiana, this State's procedural law applies in all aspects of the present case where the result is not substantially affected.
Jurisdiction and venue are quite obviously matters that are governed by Louisiana law in the present case. Diamond M is a foreign corporation authorized to do business in Louisiana, having an agent for service of process in this state. Therefore, LSA-C.C.P. art. 42(4) applies in determining whether or not venue lies in St. Mary Parish, Louisiana:
"The general rules of venue are that an action against:
* * * * * *

*1249 (4) A foreign corporation licensed to do business in this state shall be brought in the parish where its principal business establishment in the state is located, as designated in its application to do business in the state;"
It appears to be agreed by all parties that the principal place of business of Diamond M in this state is in St. Mary Parish. Therefore, venue lies in St. Mary Parish.
As to Union Oil's exception of lack of subject matter jurisdiction, the trial court obtained jurisdiction over the person of both Diamond M and Union Oil. A Louisiana court which has jurisdiction over the person and which has before it a "saving to suitors" action brought in personam under the Jones Act and general maritime law clearly has jurisdiction over the subject matter. See LSA-C.C.P. art. 2. Thus, there is no merit to Union Oil's exception of lack of subject matter.
As to the pleas of prescription and laches, these are substantive matters, to which federal law applies. The statute of limitations under the Jones Act is 3 years. Laches applies to a general maritime claim. The accident occurred on or about December 31, 1977. Cason filed suit in state court against Diamond M on May 30, 1979. A suit had earlier been filed in Federal court against both Diamond M and Union Oil, which was dismissed without prejudice on May 16, 1979. Plaintiff filed a pleading styled "Second Supplemental and Amending Petition" in state court naming Union Oil as an additional party defendant on November 29, 1979.
Clearly, the 3 year statute of limitations under the Jones Act had not expired. Especially in view of the fact that an earlier suit had been filed in Federal court against both Diamond M and Union, we find that the equitable doctrine of laches is inapplicable to the maritime claim.

NEW TRIAL
Diamond M and Cason contend that a new trial should not have been granted to Union Oil, because (1) a new trial may be granted only if the jury's finding is contrary to the "great weight" of the evidence (Narcisse v. Illinois Central Gulf Ry. Co., 620 F.2d 544 (5th Cir.1980)), and (2) the respective liabilities of Union Oil and Diamond M were so intertwined that a new trial should not have been granted as to one only. Because we agree with the second contention, we find it unnecessary to consider the merits of the first.
Applying the admiralty doctrine of comparative negligence, the jury in the first trial, as we have stated, found Diamond M 60% negligent, Union Oil 40% negligent as between the two defendants, and Cason 10% negligent. Granting a new trial to determine the negligence vel non of Union Oil inevitably affected the percentage of comparative negligence for which Diamond M would be held liable under the Jones Act. As stated in Moore's Federal Practice, Vol. 6, § 59.06 at pp. 59-80, and the cases cited therein, a partial new trial cannot be granted if the issues as to which the partial new trial is ordered are so intertwined with issues as to which it is not ordered that the partial new trial cannot be held without substantial injustice resulting therefrom. We find the granting of the new trial in the present case to have resulted in serious injustice to Diamond M, as the question of the comparative negligence of Diamond M was determined although it was not granted a new trial, and although the relative or comparative percentages of liability of Diamond M and Union Oil were bound one by the other.
As we find a partial new trial was improperly granted, we are limited to the transcript of the proceedings of the first trial in our review, and it is to that transcript that we shall confine our further consideration.

LIABILITY OF DIAMOND M
Diamond M was clearly negligent through its tool pusher, Ken Smith, in having ordered Cason to cut the gussets above the Gulf, especially in view of the fact that the well guide was not properly secured. We affirm the finding of negligence on the part of Diamond M.

*1250 LIABILITY OF UNION OIL
The original jury found Union Oil to have been 40% negligent.
In a maritime claim brought in state court, the trial court must have been "clearly erroneous" in order for its holding to be overturned. Rivers v. Schlumberger Well Surveying Corp., 389 So.2d 807 (La.App. 3d Cir.1980); Portier v. Texaco, Inc., 426 So.2d 623 (La.App. 1st Cir.1983).
The finding that Union Oil was 40% negligent, which was arrived at by the jury in the original trial, was not clearly erroneous, but was supported by the great weight of the evidence. Union Oil was negligent, in the first instance, in stationing a company representative to supervise retrieval of a well guide who had no experience with that type of procedure. Furthermore, Romero, the company representative actually so stationed, was himself guilty of negligence. Romero approved the outline of the procedures described to him by the tool pusher, Ken Smith, with regard to cutting the gussets. Romero was on the Texas Deck and should have seen that the secondary supports for the well guide in the event the upper gussets were to fail, viz. the air hoist lines, were not taut, but slack, and hence, also likely to fail in the event the upper gussets were to fail. Romero was on the Texas Deck for some 10 minutes and failed to inspect that aspect of the procedure. If Romero would have had proper and sufficient experience, or had refused to approve the procedure, or had demanded the air hoist lines be taut, the accident would not have occurred. Clearly, a finding of 40% negligence on the part of Union Oil is justified by the record.

NEGLIGENCE OF CASON
Applying comparative negligence under admiralty law, the first jury found Cason 10% negligent. This finding was clearly erroneous.
The duty of a seaman, such as Cason, is not to find the safest method for doing the work, but to do the work assigned. The seaman's duty to protect himself is slight. Bobb v. Modern Products, Inc., 648 F.2d 1051 (5th Cir.1981).
Cason worried aloud of the dangers of cutting the gussets in his conversations with both Romero and Smith. Smith assured him the procedure was safe, and in effect, ordered Cason to perform the task. Cason had no choice but to perform the task as assigned. There is nothing that would indicate he violated instructions, or failed to perform the assigned task in the safest possible manner. The jury was clearly erroneous to have found any contributory negligence on the part of Cason, in any percentage at all. Accordingly, we hold Cason free from negligence.

QUANTUM
After Cason sustained his injury and was discharged from treatment by Dr. Burt, Cason attempted to return to his old job as a maintenance welder for Diamond M. After a brief time, he found that he could not perform his duties without suffering intense pain, as he was required to assume awkward postures, principally crouching, while welding. For that reason, Cason quit his job as welder, and went to work for his father as a logger near his family home at Campti, Louisiana. He works only part time, because of pain. However, the pain is somewhat less in logging, in which he can kneel, than in welding, in which he is required to crouch.
Cason's earnings as a logger are considerably less than his earnings received when his physical condition permitted him to weld. Cason called Donald Cornwell of the Economics faculty at the University of Southwestern Louisiana to testify as to past and future loss of earnings. Mr. Cornwell testified that the loss of earnings from date of accident to date of trial was $61,048.97, bearing in mind that he worked for Diamond M as a maintenance welder briefly and as a logger on a rather permanent basis during this period. As to future loss of earnings, Mr. Cornwell testified that Cason's work life expectancy, at date of trial, was 30.15 years. Using this figure, Mr. Cornwell testified that future loss of earnings, assuming Cason were to continue to work as a logger, would come to $239,706.72, *1251 without consideration of inflation. The total figure would thus be $300,755.69. If Cason were to receive only the minimum wage, rather than wages as a logger, his total loss of earnings would come to $467,718.97.
The jury found total damages to plaintiff in the amount of $493,000. The interrogatories submitted to the jury did not permit the jury to break this sum down. Cason testified that he continued to suffer pain up to the date of the trial. Dr. Burt, the treating physician, testified that he had no reason to doubt the veracity of Cason's statement that he continued to experience pain as a result of the injury to his back. He testified that in his opinion Cason had sustained a permanent disability to the entire body of 15 to 35% as a result of the accident. He further testified that the American College of Orthopedic Surgeons would place the disability of the entire body at 25%. A specialist who saw Cason on two occasions as an examining physician, Dr. Norman H. Morin of New Orleans, likewise testified that Cason continued to experience pain, and should not return to any type of work requiring bending, as to do so would inevitably cause his condition to worsen.
Thus, Cason experienced severe pain, and will continue to experience pain, in all likelihood, the remainder of his life. Considering pain and suffering, and partial future loss of income, we do not find the jury's assessment of the loss to be excessive.
Defendants contend that the testimony of Dr. Burt and Dr. Morin was in conflict, as Dr. Morin seemed to think that Cason should not return to his job as maintenance welder while Dr. Burt released Cason to return to his job in that capacity. Defendants cite the well-known proposition that the testimony of the treating physician is to be preferred to that of a physician who examines the injured person only once or twice. Lockhart v. Pargas, Inc., 271 So.2d 664 (La.App. 1st Cir.1972), writ refused 273 So.2d 844 (La.1973). Knighten v. AM Amusement Co., 272 So.2d 60 (La.App. 4th Cir.1973). The statement that the physicians' testimony is in conflict glosses over the essential similarity of their respective findings. Taking their testimony as a whole, we see from a reading of the transcript that both Dr. Morin and Dr. Burt thought Cason had sustained permanent damage to the discs lying between the compressed vertebrae, and both believed him to be in pain at their last examination. Neither physician was an expert in the requirements of the duties of a maintenance welder. Cason testified that because he was required to assume a crouching position while welding, he could not perform his duties as maintenance welder without severe pain. The trier of fact has to weigh both medical and lay testimony in assessing damages, and considering the credibility and the relative qualifications of the experts and the credibility of all witnesses, to arrive at a result. Touchet v. Fidelity and Cas. Co. of New York, 264 So.2d 752 (La. App. 3d Cir.1972); Guidry v. Davis, 382 So.2d 250 (La.App. 3d Cir.1980).
The trial court's charge to the jury contained the following statement:
"You as members of the jury are entitled to give greater weight to the opinion of a treating physician than that of a physician who has not examined the patient, or who has examined the patient for purposes of evaluation only. However, you are entitled to give credibility to the testimony of any witness as you think it deserves."
We cannot say, in the light of the law, that this portion of the charge to the jury was in error, or, in light of the great weight of the medical and lay testimony that Cason was still in pain, or especially Dr. Burt's testimony that Cason had sustained a 15% to 35% permanent disability of the entire body as a result of the accident, that the jury's assessment of damages was clearly erroneous. See Rivers v. Schlumberger Well Surveying Corp., supra.
The trial court limited the award of damages to Cason to the sum of $443,700.00, because of the jury's finding of 10% negligence on the part of Cason. As we have found Cason not to have been negligent at all, we increase the total award to the full sum of $493,000.00. The percentages of *1252 negligence shall be apportioned between Diamond M and Union Oil as set forth below:

LIABILITY
As we find that Cason was not negligent in any degree, it follows that 60% of the total negligence is attributable to Diamond M, and 40% of the total negligence is attributable to Union Oil.
However, the original drilling contract, entered into between Diamond M and Mobil Oil Corporation, under date of February 21, 1977, contained an indemnity clause in favor of Mobil in which Diamond M agreed to hold Mobil harmless from death, injury, or property damage arising out of the performance of the contract. This contract provided for Diamond M to drill a well at Main Pass Block 72-74 # 2. By letter from Mobil to Diamond M, dated August 25, 1977, with copy to Union Oil, it was stated that pursuant to telephone conversation, Diamond M was to drill a well under the same drilling contract in Union-Mobil High Island Block A-443, with Union as operator. The signature of a representative of Diamond M appears at the bottom of the letter approving the agreement. The letter states that the agreement "will fulfill commitments" of both parties. Both Diamond M and Union agree that by virtue of this letter all provisions of the drilling contract, including the indemnity provisions, were made applicable in favor of Union Oil against Diamond M.
The indemnity and insurance provisions of the contract between Mobil and Diamond M, the rights under which, as we have stated, were made applicable in favor of Union Oil, read in their entirety as follows:
"14. INSURANCE AND INDEMNITY
14.1 At any and all times during the term of this agreement, Contractor agrees to maintain in force and submit evidence of insurance equal to or in excess of the requirements detailed in Exhibit B attached hereto and made a part hereof.
14.2 All insurance shall be carried in a company or companies acceptable to Mobil and shall be maintained in full force and effect during the term of this agreement, and shall not be canceled, altered, or amended without ten (10) days prior written notice having first been furnished Mobil. Upon request Mobil shall be furnished certified copies of all such insurance policies.
14.3 In the event Contractor is a self-insurer and Mobil has consented to Contractor's being a self-insurer as to any one or more of the risks as to which coverage is required, evidence of such consent must be in writing and approved by a representative of Mobil authorized to enter into such consent agreement. It is recognized that Contractor is self-insured for $250,000.00 of Workmen's Compensation and General Liability.
14.4 Contractor shall protect, indemnity (sic) and save Mobil harmless against any and all claims, demands and causes of action of every kind and character made against Mobil or in which Mobil may be named party defendant by Contractor's employees, agents, or invitees, on account of personal injury or death, or on account of property damages (other than property damages specifically provided for in paragraphs 6.1, 6.2 and 6.3) occurring, growing out of, incident to, or resulting directly or indirectly from, the work to be performed by Contractor hereunder, irrespective of whether such claims are occasioned, brought about, or caused in whole or in part by the negligence of Mobil, or by the unseaworthiness of the Diamond M 99, and for damages for infringement of any patent as more particularly set forth in Paragraph 22 hereof."
Paragraph 14.4 clearly obligates Diamond M to indemnify Mobil, and thereby Union Oil, from all claims against Mobil (Union Oil) arising out of property damages, personal injury, or death, in the performance of the contract, even claims arising in whole or in part from the negligence of Mobil. Thus, the contract, unless limited by state or admiralty law, obligates Diamond M to indemnify Union Oil fully from all claims Cason has against Union Oil arising out of the accident sued upon, even though, as in the present case, the accident resulted in part from the negligence of Union Oil.
*1253 The trial court applied Texas statutory law to the indemnity agreement, and limited Union Oil's right to indemnity to $100,000.00 under effect of Texas law. The provisions of Texas Revised Civil Code Annotated, Article 2212, would, generally stated, have the effect of limiting liability of a drilling contractor under an indemnity clause to the amount agreed to be covered by insurance. Louisiana, after the date of the accident sued upon, adopted an even broader statute, voiding indemnity provisions in such circumstances. See LSA-R.S. 9:2780, added Act No. 427 of 1981, amended 1981, 1982.
However, we find that neither Louisiana law nor Texas law applies, but as the contract between Diamond M and Mobil (Union Oil) is a maritime contract, the admiralty law affecting indemnity contracts as applied by courts in the United States applies. See A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., 256 F.2d 227 (2nd Cir.1958); Hudson Waterways Corp. v. Coastal Marine Service, Inc., 436 F.Supp. 597 (E.D.Tex.1977).[2] These cases recognize the need for uniformity between the laws affecting indemnity under maritime contracts, and clearly and squarely hold that the Federal admiralty law affecting indemnity contracts is to be applied. Hudson Waterways states that clauses in maritime contracts containing indemnity or release from liability provisions which indemnify the indemnitee for the consequences of its own negligence are to be fully enforced, with but one exception, towing contracts. In these contracts release from liability clauses providing indemnity for the indemnitee's negligence are denied any effect whatsoever as a matter of public policy. The towing contract exception with regard to release clauses was first clearly recognized in Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), as a matter of public policy, for two main reasons, the court stated, (1) to discourage negligence and (2) to protect those who are unable to negotiate on equal terms with towing companies. It is true that drilling companies often do not negotiate on equal terms with major oil companies in entering into contracts to drill wells, and Bisso's policy consideration clearly lies behind the Louisiana and Texas statutes cited above. However, under Ludwig, supra, and Hudson Waterways, supra, the statutes of these states are inapplicable, and we are reluctant indeed and unwilling to create an additional exception to the general rule of the federal courts that indemnity clauses in admiralty contracts shall be enforced as written where, as in this contract, the language of the indemnity provision is clear and unequivocal.
We, therefore, give effect to paragraph 14.4 of the drilling contract between Mobil and Diamond M obligating Diamond M to indemnify Mobil, and, by subsequent agreement, Union Oil, from any claim from personal injury, death, or property damage made against Mobil (Union Oil). Thus, Union Oil must be indemnified by Diamond M to the full extent of its liability to Cason arising out of the accident sued upon.

DECREE
For the reasons set forth above, we set aside and vacate the judgment of the trial court, and render judgment:
(1) In favor of Delton H. Cason, and against Union Oil Company of California, *1254 for 40% of $493,000.00, or $197,200.00, together with legal interest from July 9, 1981.
(2) In favor of Delton H. Cason, and against Diamond M Drilling Company, for 60% of $493,000.00, or $295,800.00, together with legal interest from July 9, 1981.
(3) In favor of Union Oil Company of California and against Diamond M Drilling Company, for 40% of $493,000.00, or $197,200.00, together with legal interest from July 9, 1981.
(4) Against Diamond M Drilling Company, for all costs at trial and on appeal.
VACATED AND RENDERED.
NOTES
[1] Diamond M also filed an exception of no right of action which was overruled by the trial court. No appeal from that ruling was taken.
[2] Cf. Dickerson v. Continental Oil Co., 449 F.2d 1209 (5th Cir.1971), which held that the Outer Continental Shelf Lands Act, 43 U.S.C.A. Sec. 1331 et seq., made Louisiana law applicable to an indemnity agreement affecting a fixed drilling platform because the fixed drilling platform was not a "vessel". The case of Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817 (5th Cir.1975) held that Louisiana law applied to an indemnity agreement, relying solely upon Dickerson as authority although it found the movable storage tank therein involved to be a "vessel". If Dickerson had been interpreted properly, Louisiana law would not have been applied in Hicks, as in Hicks the indemnity agreement involved a "vessel", which is clearly excluded from the Outer Continental Shelf Lands Act, to which the reasoning in Dickerson is limited. Clearly the drilling barge involved in the present case was likewise a "vessel", and Federal law, not Louisiana law adopted as Federal authority by the Outer Continental Shelf Lands Act, applies to the present indemnity agreement.