512 F.2d 817
 Clyde E. HICKS, Plaintiff-Appellee,
v.
OCEAN DRILLING AND EXPLORATION COMPANY, Defendant-Third
Party Plaintiff- Appellant-Appellee,
H. B. BUSTER HUGHES, INC., Third Party Defendant-Appellant.
Hester GOFORTH, Plaintiff-Appellee,
v.
OCEAN DRILLING AND EXPLORATION CO., et al.,
Defendants-Appellants-Appellees,
H. B. Buster Hughes, Inc., Defendant-Appellant.
Charles Norman GLOVER, Plaintiff-Appellees,
v.
OCEAN DRILLING EXPLORATION CO., et al.,
Defendants-Appellants-Appellees,
H. B. Buster Hughes, Inc., Defendant-Appellant.
 No. 73-2169.
 United States Court of Appeals,
Fifth Circuit.
 May 7, 1975.
Rehearing Denied June 4, 1975.
 
 Chester Francipane, Wayne H. Scheuermann, Metairie, La., for Buster hughes.
 James F. Holmes, New Orleans, La., for Ocean Drilling.
 Arthur F. Dumaine, John M. Lawrence, New Orleans, La., Salvador E. Gutierrez, Jr., Arabi, La., for Clyde Hicks.
 A. Remy Fransen, Jr., New Orleans, La., for Hester Goforth and Charles Glover.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before JONES, THORNBERRY and COLEMAN, Circuit Judges.
 JONES, Circuit Judge:
 
 
 1
 A New Orleans shipbuilder, Higgins, Inc., constructed at its shipyard on the Industrial Canal in that city, for Ocean Drilling and Exploration Company, herein called ODECO, a submersible oil storage facility which became known as the Round Barge. This facility is made up of a superstructure two hundred feet in length and fifty-four feet in width constructed approximately forty feet above cylindrical storage tanks fourteen and one-half feet in diameter. Two of the tanks run the entire length of the superstructure. These are connected to four storage tanks evenly spaced and running the width of the superstructure. This rectangular assemblage of tanks forms the lower structure of the Round Barge. There is a continuous fin or skirt five feet in height around the entire underside of the cylindrical storage tanks, specifically designed to sink the structure in a vertical position in the mud floor of the Gulf of Mexico and to hold the facility in a stationary position. The fin was attached to the outer tanks.
 
 
 2
 The Round Barge was towed from the shipyard where it was constructed to the site in the Gulf where it was then to be used. It was lowered by flooding the tank at one end of the Barge with water. When it had come to rest on the bottom, the tank on the other end was filled and it descended to the floor of the Gulf. In addition to the fin, about half of each of the tanks sank into the mud or silt on the bottom of the Gulf. The two tanks across the ends of the Round Barge usually contained water ballast. Sometimes other tanks contained water but those were more often used for the storage of oil. Rock ballast was also used to keep the facility at the bottom of the Gulf.
 
 
 3
 The Round Barge was attached to a header platform constructed on conventional pilings. Pipelines from producing wells were connected to the header platform, which was connected to the Round Barge by flowlines and a catwalk. By this method oil reached the storage tanks. The facility was equipped with a galley and quarters for the crew.
 
 
 4
 Although ODECO claimed, at the trial, that the Round Barge was designed for the place where it was located, it was designed and constructed so that it could be raised for scraping and repair, and could be moved to another site for storage of oil. Consideration had been given to moving it to a different location in the Gulf. The refloating of the facility would be accomplished by disconnecting the catwalk, flowlines and the like from the header platform and then reversing the installation process by pumping out the water ballast, causing the structure to float.
 
 
 5
 H. B. Buster Hughes, Inc., one of the appellants, is an oilfield contractor. It supplied a labor crew to ODECO for the Round Barge under a master service contract. Clyde E. Hicks, Charles Norman Glover and Hester Goforth, who were plaintiffs in the district court and are appellees in this Court, were members of the crew furnished by Hughes to ODECO. All of their work was done on the Round Barge or on other ODECO facilities. Glover was a cook's helper, Hicks was a roustabout and Goforth was a welder.
 
 
 6
 Hicks testified that he was paid and employed by Hughes. His immediate superior was a Hughes toolpusher named Shepherd. Hicks usually got his orders from Shepherd, or from Punch, a Hughes Supervisor or Superintendent. Shepherd and Punch received their orders from an ODECO Field Superintendent named Aucoin. When asked if he was permitted to refuse to do what Aucoin told him to do, Hicks stated that he was permitted to quit. He further testified that Shepherd and Punch helped with the work, rather than merely coming by to check on him from time to time.
 
 
 7
 Goforth testified that he was employed and paid by Hughes. Goforth said that he usually got his orders from Aucoin, even though Punch was present. He was asked if this was not "just because he knew you", and gave the ambiguous response that "yes sir, because I had worked with him so long and for what reason, I couldn't answer that." Goforth related that on one occasion Aucoin had discharged an employee who was on the Hughes payroll. He stated that Aucoin had sometimes countermanded orders given by Punch. Goforth never asked Punch whether he should take orders from anyone else because he knew that Aucoin was "strictly boss over the whole works."
 
 
 8
 Glover took his instructions directly from a cook who was an ODECO employee.
 
 
 9
 On the night of April 25, 1971, Larry Braud, the head gauger on the Round Barge and an employee of ODECO, had pumped oil from storage tanks into a tanker. This operation was completed at about 3 A.M. Braud, pursuant to instructions from an ODECO supervisor, put into operation the pumps for removing the salt water ballast from the center line tanks.
 
 
 10
 About six[1] in the morning of April 26, 1971, the incident occurred from which this litigation arose. Glover had been working. Hicks and Goforth were earning time. The removal of the ballast caused the Round Barge to shake, tilt and to refloat on one side.
 
 
 11
 Hicks, Goforth and Glover were injured. They brought separate actions under the Jones Act[2] against ODECO. Each alleged the unseaworthiness of the platform and asserted Maritime Tort claims against ODECO as separate causes of action. Goforth and Glover named H. B. Buster Hughes, Inc. as an original defendant to their Jones Act claims and also sought recovery against ODECO on the basis of Article 2315 of the Louisiana Civil Code which requires one whose fault causes damage to another to repair it. ODECO filed cross claims and a third-party action against Hughes seeking indemnity under the service contract. The three actions were consolidated and tried before a jury. ODECO's indemnity claims against Hughes were reserved for decision by the district judge. Considerable testimony was taken at the trial of the consolidated actions. Much of it was directed to the issues of whether the Round Barge was a vessel and whether the plaintiffs were borrowed servants of ODECO.
 
 
 12
 At the conclusions of the testimony before the jury, Goforth and Glover dismissed their claims against Hughes.
 
 
 13
 In addition to giving the conventional jury instructions on burden of proof, negligence, causation and damages, the court gave charges on the tests for determining, among other things, whether a structure or facility is a vessel, whether employees are borrowed servants, whether the plaintiffs were members of the crew of the Round Barge, and for ascertaining whether a vessel is or is not seaworthy.
 
 
 14
 As to the test for determining whether the Round Barge was a vessel the district court said:
 
 
 15
 "The primary meaning of the term "vessel," is any water craft or other contrivance used or capable of being used as a means of transportation on water. The term "vessel," may also include, however, various special purpose crafts, such as barges or dredges, which do not operate as a vessel for transportation, but, rather serve as moveable floating bases that may be submerged, so as to rest on the bottom and be used for stationary operations, such as drilling or dredging. Now, although mere flotation may not in and of itself be sufficient to make a structure a vessel, if a structure is buoyant and capable of being floated from one location to another, it may be found to be a vessel, even though it may have remained in one place for a long time and even though there are no plans to move it in the foreseeable future. Now, in considering whether a special purpose craft is a vessel, the determinative factors are the purposes for which the craft was constructed and the business, in which it is engaged. That is, was the craft designed for and used in navigation or commerce? A craft not designed for navigation and commerce, however, may be classified as a vessel, if at the time of the accident, it had actually been engaged in navigation or commerce. Now, in considering whether a special purpose craft is a vessel, the manner, in which a party or parties may have referred to or denominated such craft in contracts or other documents is not necessarily determinative of its status as a vessel, but is simply a factor for you to consider along with all the other evidence."
 
 
 16
 The borrowed servant doctrine, as here applicable, was thus stated by the district court in its charge to the jury:
 
 
 17
 "Now, the various criteria have been considered in determining when the doctrine of borrowed servant is applicable. While no one of these factors or any combination of them is decisive and no fixed test is used to determine the existence of a borrowed servant relationship, certain guidelines have been given great weight. The most universally accepted standard for determining whether a person is a borrowed servant is to ascertain who controls him in that employment and who has the power and the right to control and direct him in the performance of his work. In order to establish that the employee is the borrowed servant of another, the plaintiffs may establish, among other possible elements of proof, that the borrowing employer exercises control over the employee and has the right to control him. They may establish that the general employer has relinquished the right to control. They may establish that the borrowing employer has assumed the obligation for the payment of the employee's wages. They may establish that the employee is performing work for the borrowing employer and in the latter's business. They may establish that the temporary or borrowing employer has furnished the necessary instruments and the place of performance for the work in question. Now, although a formal agreement between the employers, that is ODECO and H. B. "Buster" Hughes, Incorporated, is not indispensible, the existence or nonexistence of such an agreement should be considered. In considering whether the power exists to control and direct an employee, a careful distinction must be made between authoritative action and control on the one hand and mere suggestions as to detail or necessary cooperation, where the work furnished is part of a larger undertaking. On the other hand, cooperation as distinguished from subordination is not enough to create the employment relationship necessary to activate the borrowed servant doctrine."
 
 
 18
 The court told the jury that if it found that the Round Barge was a vessel and that the plaintiffs were members of the crew of the vessel or performed functions traditionally performed by seamen it would become necessary to determine whether the Round Barge was unseaworthy in one or more respects. If it was manned by an incompetent crew at the time of the accident, or was improperly equipped by the lack of safety devices it could be found unseaworthy, and if unseaworthiness be found, it must also be found that it was a proximate cause of the injuries.
 
 
 19
 None of these jury instructions were challenged by the defendants. In response to specific interrogatories the jury found that the plaintiffs were borrowed servants of ODECO, that they were members of the crew of the Round Barge, that the Round Barge was a vessel, that ODECO was negligent, that its negligence was a cause of or contributed to the plaintiffs' injuries, that the plaintiffs were members of the crew or performed work on the Round Barge which work is traditionally performed by seamen, that the Round Barge was unseaworthy, that the unseaworthiness of the Round Barge was a proximate cause of plaintiffs' injuries, and that ODECO's negligence was the proximate cause of the plaintiffs' injuries.
 
 
 20
 The jury returned a verdict against ODECO for Hicks in the amount of $177,000, in favor of Goforth for $212,000 and in favor of Glover for $90,000.
 
 
 21
 Following the jury trial on the issues of liability and damages the court without a jury, tried the indemnity claim of ODECO against Hughes. The cause of action was based upon the indemnity provisions of a Master Service Contract between ODECO and Hughes. In this instrument ODECO is referred to as "Drilling Contractor" and Hughes is designated as "Subcontractor."
 
 
 22
 The indemnity provision reads,
 
 
 23
 "Subcontractor agrees to indemnify and hold harmless Drilling Contractor from and against any and all liens and claims for labor or material, and against any and all claims, demands, or suits for damages to persons and/or property (including, but not limited to claims, demands, or suits for bodily injury, illness, disease, death, loss of services, maintenance, cure, property or wages), which may be brought against Drilling Contractor (including, but not limited to those brought by Subcontractor's employees and agents and the agents and employees of its subcontractors) incident to, arising out of, in connection with, or resulting from the activities of Subcontractor, its employees and agents, or its subcontractors and their employees and agents, or in connection with the work to be performed, services to be rendered, or material to be furnished, under this contract, or under contracts referred to in 1(b) above, whether occasioned, brought about or caused in whole or in part by the negligence of Drilling Contractor, its agents, directors, officers, employees, servants or subcontractors, or otherwise, or by the unseaworthiness of any vessel owned, operated or controlled by Drilling Contractor, regardless of whether such negligence or unseaworthiness be active or passive, primary or secondary."
 
 
 24
 Attached to the Master Service Contract was a certificate of insurance which insured Hughes to the extent of $300,000 against its liability under the contract. The insurance policy was not incorporated in or referred to in the service contract.
 
 
 25
 The district court resolved the indemnity question for ODECO and against Hughes. Post-trial motions were denied, judgments for the several plaintiffs were rendered against ODECO for the amounts of the verdicts. Judgment for the full amount of these recoveries was rendered in favor of ODECO and against Hughes. ODECO and Hughes have taken separate appeals.
 
 
 26
 ODECO, on this appeal, asserts that the finding of the jury that the Round Barge was a vessel was not supported by the evidence. It compares the Round Barge to a drydock and directs the court's attention to those precedents which hold that a drydock is not a vessel for maritime jurisdiction. See Atkins v. Greenville Shipbuilding Corporation, 5th Cir. 1969, 411 F.2d 279, where it was held that flotation was not enough to constitute a structure a vessel. It was said that a drydock is not a vessel any more than is a wharf or warehouse when projecting into or upon the water. The distinction, as noted in the Atkins case, is the absence of the element of risk and the hazards of the sea. The Round Barge was not attached to the shore and had full exposure to the risks and hazards of the sea. The contention of ODECO is that the connection of the Round Barge to the header platform, which was constructed on conventional pilings, was the equivalent of the shore attachment of a drydock. The comparison is not well taken. The bottom of the Gulf is not shore and the catwalk and flowlines did not secure the one structure to the other. The Round Barge is not comparable to a stationary platform as ODECO suggests.
 
 
 27
 This court recently stated that the purpose for which a facility was constructed and the business in which it is engaged are the controlling considerations in determining whether or not the facility is a vessel. Cook v. Belden Concrete Products, Inc., 5th Cir. 1973, 472 F.2d 999, cert. den., 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 in that case a flat-deck barge which was moored alongside a concrete yard and used as a construction platform was held as a matter of law not to be a vessel. The barge had no motive power of its own. It was submersible so as to permit launching of finished barges. Upon completion of a set of barges, the platform would be towed to deeper water for launching. It would sometimes be moved to different positions along the dock to pick up materials. At the time of the injury which gave rise to the action the platform was secured to the dock by ropes. The district court granted summary judgment in favor of Belden, the employer. The issue on appeal was whether as a matter of law the platform was a vessel for purposes of maritime jurisdiction. The appellant cook attempted to distinguish the platform from a drydock because of the platform's limited movement. The court rejected this approach. It stated that permanence of fixation is not the criterion which governs the maritime status of floating drydocks and similar structures. The court stated that,
 
 
 28
 "Conventional ships and barges as well as such unconventional craft as submersible drilling barges and floating dredges which are designed for navigation and commerce are vessels within general maritime and Jones Act jurisdiction and retain such status even while moored, dry-docked, or otherwise immobilized and secured to land." 472 F.2d 999, 1001.
 
 
 29
 The Round Barge of this case is very similar to a submersible drilling barge or platform, one of the unconventional craft referred to in the foregoing quotation. Such structures are vessels for Jones Act jurisdictional purposes.
 
 
 30
 A submersible drilling barge, like the Round Barge, has no motive power in itself but is capable of being moved through navigable water under tow. When in use for the drilling for oil or gas the drilling barge rests, as does the Round barge, on the bottom of the Gulf. Like the Round Barge it has a galley and quarters for its crew. On occasions this Court has held that a submersible drilling barge is a vessel. Offshore Company v. Robison, 5th Cir.1959, 266 F.2d 769; Producers Drilling Company v. Gray, 5th Cir.1966, 361 F.2d 432. Both of the cited cases were for personal injuries sustained by an employee working on the structure while it was resting on the bottom of navigable waters. Both were Jones Act cases. In the Offshore case the court observed that the Jones Act had been extended to cover "Almost any structure that once floated or is capable of floating on navigable waters" and that the word "vessel" includes "special purpose structures not usually employed as a means of transport by water but designed to float in water ..." 266 F.2d 769, 771, 779.
 
 
 31
 In the Producers case the court said, "It is well settled that a barge may be a vessel...." Here we have a special purpose barge designed to serve as a mobile drilling platform. At the time of the accident, the barge was being used for that purpose. The barge is equipped for use in navigable waters, had traveled a considerable distance through such waters to its present site and was, at the time of the accident, located in a navigable canal." 361 F.2d 432, 437.
 
 
 32
 We only need to change "mobile drilling platform" to read "oil storage facility" and the language applies to the Round Barge.
 
 
 33
 The evidence was more than adequate to support the jury's finding that the Round Barge was a vessel within the provisions of the Jones Act and the general maritime jurisdiction. It is not unlikely that a determination could be made that the Round Barge was a vessel as a matter of law if such a ruling was appropriate.
 
 
 34
 ODECO contends that the jury finding that Hicks, Goforth and Glover were borrowed employees of ODECO was not supported by the evidence. The evidence warranted the submission of employment status to the jury. The court's instruction, to which no exception was taken, fully and fairly stated the applicable law. Dugas v. Pelican Construction Company, Inc., 5th Cir. 1973, 481 F.2d 773, cert. den., 414 U.S. 1093, 94 S.Ct. 723, 38 L.Ed.2d 550; Ruiz v. Shell Oil Co., 5th Cir. 1969, 413 F.2d 310. ODECO's position is without sound basis.
 
 
 35
 The other contentions of ODECO have been considered. They need not be discussed. They are without merit.
 
 
 36
 The district court granted indemnity in favor of ODECO against H. B. Buster Hughes, Inc., for the full amount of the judgments in favor of Hicks, Glover and Goforth. The court stated that the Master Service Contract between ODECO and Hughes was in effect, that it governed the relationship of ODECO and Hughes at the time of the accident, and paragraph 9 of the contract entitled ODECO to indemnity. Hughes contends that ODECO is not entitled to indemnity because the negligence was not, nor was the accident itself related in any way to the activities of Hughes as required by the indemnity paragraph. Hughes asserts that the accident arose out of activities exclusively under the control of ODECO, that there was no work of Hughes being performed at the time of the negligent acts or the occurrence of the accident, and that the accident did not occur at a place prescribed by work orders. The interpretation which Hughes urges is too narrow. Hughes agreed to indemnify ODECO for claims for damages "incident to, arising out of, in connection with, or resulting from the activities of subcontractor ... or in connection with the work to be performed, services to be rendered, or material to be furnished, under this contract...." The accident falls within the scope of the quoted language.
 
 
 37
 Hughes contends that the Master Service Contract applies only in situations where Hughes is performing work as an independent contractor. Paragraph 13 of the contract is as follows:
 
 
 38
 "Subcontractor shall be an independent contractor with respect to the performance of all work hereunder, and neither Subcontractor nor anyone employed by Subcontractor shall be deemed for any purpose to be the employee, agent, servant, or representative of Drilling Contractor in the perfomance of any work or service or part thereof in any manner dealt with hereunder. Drilling Contractor shall have no direction or control of the Subcontrator or its employees and agents except in the results to be obtained. The work contemplated herein shall meet the approval of Drilling Contractor and be subject to the general right of inspection for Drilling Contractor to secure the satisfactory completion thereof. The actual performance and superintendence of all work hereunder shall be by Subcontractor, but Drilling Contractor or its representatives shall have unlimited access to the operations to determine whether work is being performed by Subcontractor in accordance with all the provisions of this Contract and the work order."
 
 
 39
 The district court rejected this contention as a "grossly erroneous interpretation of the contract" and construed paragraph 13 as establishing that, as between Hughes and ODECO, Hughes was an independent contractor at all times. The court stated that the scope of the contract was set forth in paragraph 1(a), where it was provided that the contract should govern and control all work by Hughes. The district court deemed it unnecessary to determine whether Hughes was an independent contractor in relation to Hicks, Goforth and Glover. In support of its contention that evidence should have been admitted as to the interpretation of the contract, Hughes relies primarily upon Tidewater Oil Company v. Travelers Insurance Company, 5th Cir. 1972, 468 F.2d 985, and Warren Petroleum Corporation v. J. W. Green Contractors, 5th Cir. 1969, 417 F.2d 242. In each of the cited cases the pertinent contract provision was ambiguous. In the case before us the provision is unambiguous. There is no need to look beyond the instrument to determine the intent of the parties. The district court was correct in refusing to admit testimony as to the meaning of the contract.
 
 
 40
 Hughes next asserts that the contract was invalid because there was no meeting of the minds. It says that there was no bargaining or discussion on any of the contract terms, that Hughes was given no opportunity to reject the indemnity provisions short of rejecting all work for ODECO, that the parties differ on their interpretation of the contract, and that there was no explanation of any of the contract terms. This contention can be disposed of by a brief statement of the Louisiana Court of Appeals which states the controlling rule in these terms:
 
 
 41
 "A party who signs a written instrument, or who places his mark or allows his mark to be placed thereon, is presumed to know its contents, and he cannot avoid the obligations which may be imposed on him by that instrument merely upon a showing that he had not read it, or that he had not had it read and explained to him, or that he did not understand its provisions." St. Landry Loan Co., Inc. v. Avie, La.App.1962, 147 So.2d 725, 727.
 
 
 42
 Hughes urges that a clause in a contract which purports to indemnify a vessel owner against its own negligence is against public policy and void. The basis for its position is found in Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. If the Bisso case is a controlling precedent it would require a holding that the indemnity clause in the ODECO-Hughes contract was invalid. However, Bisso involved a towing contract governed by the maritime law. The indemnity clause in the contract before us is to be construed under the law of Louisiana, and being so construed it is not in violation of public policy. Dickerson v. Continental Oil Co., 5th Cir., 449 F.2d 1209, cert. den., 405 U.S. 934, 92 S.Ct. 942, 30 L.Ed.2d 809.
 
 
 43
 In Bisso v. Inland Waterways Corporation, supra, one of the reasons given for the rule there adopted was "to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." 349 U.S. 85, 91, 75 S.Ct. 629, 633, 99 L.Ed. 911. Hughes would have such protection as this might give him. It is unnecessary to consider the reason for a rule which is inapplicable to a case under consideration, but if it were otherwise Hughes could not prevail. The district court stated, "Buster Hughes was an experienced company of substantial size, itself. So I find as a matter of fact that there was no policy reason to hold the contract invalid because of the relative size of the companies or position in the market." We accept this determination of the trial court.
 
 
 44
 The final contention of Hughes is that the recovery against it by ODECO, if any, should be limited to $300,000. The Master Service Contract provides, in part that:
 
 
 45
 "At any and all times during the term of this Agreement, Subcontractor agrees to carry insurance of the types and in the minimum amounts as follows:
 
 
 46
 "Comprehensive general liability insurance with minimum limits of $100,000.00 for injury to or death of any one person and $500,000.00 for any one accident and with minimum limits of $300,000.00 for property damage. Such insurance shall additionally cover the contractual liabilities and indemnities herein assume by Subcontractor with minimum limits of $500,000.00."
 
 
 47
 Attached to the contract between ODECO and Hughes, when it was put in evidence by ODECO, was a certificate of insurance providing for $300,000 liability coverage. The liability of Hughes is no more than the amount of insurance required by the contract. Dickerson v. Continental Oil Company, supra. Hughes reasons that the certificate showing insurance of a lesser amount than provided in the contract, and the introduction of the contract in evidence with the certificate attached effected an amendment to the contract. We have not been referred to any principle of contract amendment, waiver or estoppel which relieves a party from a contractual undertaking by the doing of something less than the agreement requires in the absence of something done by the party to whom the duty is owed. ODECO is entitled to recover for the full amount of the judgments against it.
 
 
 48
 No reversible error has been shown. The judgments of the district court are
 
 
 49
 Affirmed.
 
 
 
 [1]
 Goforth fixes the time at 6:05
 
 
 [2]
 46 U.S.C.A. § 688