GULOTTA, Judge.
In this Jones Act and maritime tort claim by a worker injured on an offshore drilling platform, plaintiff appeals from a judgment dismissing his suit on exceptions of prescription. We affirm.
Malcolm McIntosh was injured on July 25, 1977, while working on an oil drilling platform known as the “Piper Alpha” in the North Sea off the coast of Scotland. Almost three years later, on July 20, 1980, McIntosh filed a Jones Act and maritime tort claim in the Civil District Court in Orleans Parish against Occidental Petroleum Corporation, et al. (owners of the platform), Bawden Drilling, U.K., Ltd., et al. (plaintiffs employer), and J. Ray McDer-mott & Co., Inc., et al. (designers and manufacturers of the platform).
After extensive discovery, all defendants filed exceptions of one year prescription on the grounds that the alleged accident had occurred on a fixed drilling platform that was not a “vessel” within the meaning of the Jones Act and federal maritime law, and that plaintiffs claim was therefore subject to the one-year prescriptive period for tort suits under Louisiana law. The defendant designers and builders of the platform also filed a motion for summary judgment on the grounds that they were *186 not involved in the design or construction of the equipment that allegedly had caused plaintiffs injury. The trial judge granted the exceptions and the motion for summary judgment, dismissing plaintiffs claims against all defendants.
Appealing, plaintiff, contends the trial judge erred in determining as a matter of law that the drilling platform was not a “vessel”. According to plaintiff this factual question should have been submitted to the jury. Plaintiff claims the facts and inferences from the evidence in the instant case create a reasonable dispute whether the platform is a “special purpose structure” capable of floatation that can be accorded the status of a vessel under the Jones Act. We disagree.
In order to recover benefits under the Jones Act, a plaintiff must be a “seaman” who has, inter alia, a connection with a “vessel in navigation”. Bernard v. Binnings Const. Co., Inc., 741 F.2d 824 (5th Cir.1984). Although the question of seaman status, even in marginal cases, is ordinarily submitted to the jury, it can be determined by the judge where the underlying facts are undisputed and the only rational inference to be drawn from the evidence is that the worker is not a seaman. Bernard v. Binnings Const. Co., Inc., supra; Beard v. Shell Oil Co., 606 F.2d 515 (5th Cir.1979). Rodrigue v. O’Neal, 430 So.2d 1235 (La.App. 1st Cir. 1983).
In the determining whether or not a particular structure or facility is a Jones Act vessel, the controlling considerations are the purpose for which the facility was constructed and the business in which it is engaged. Bernard v. Binnings Const. Co., Inc., supra; Blanchard v. Engine & Gas Compressor Serv., 575 F.2d 1140 (5th Cir.1978); Hicks v. Ocean Drilling and Exploration Company, 512 F.2d 817 (5th Cir.1975), cert denied H.B. Buster Hughes, Inc. v. Ocean Drilling and Exploration Co., 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976). Although the term “vessel” traditionally refers to a structure designed or utilized for “transportation of passengers, cargo or equipment from place to place across navigable waters”, factors such as its size, its ability to float, permanence of its fixation to the shore or bottom, and movement or capability of movement across navigable waters are not conclusive. Cook v. Belden Concrete Products, Inc., 472 F.2d 999 (5th Cir.1973), cert denied, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973); Bernard v. Binnings Const. Co., Inc., supra. “Special purpose craft” used in the oil and gas business have sometimes satisfied the criteria for vessel status, even though quite different from traditional ships and barges. Blanchard v. Engine & Gas Compressor Serv., supra; Bernard v. Binnings Const. Co., Inc., supra.
The evidence in connection with the exceptions of prescription and the motion for summary judgment establish the following undisputed facts concerning the drilling platform. The platform is a self-contained structure designed to perform offshore oil drilling and production operations in the North Sea off the coast of Scotland. As the design diagram illustrates (see Appendix I to this opinion), the structure is a massive steel platform standing in 474 feet of water and affixed to the seabed by piles driven hundreds of feet below the ocean floor to support oil drilling and production facilities 78 feet above the water’s surface.
The process for installing the platform at its offshore location took several months during 1975-1976. After assembly on land in Scotland, the supporting platform was welded atop a barge and towed offshore to the drilling site where it was “launched” to float in the water by means of a ballasting system on the four corner legs of the structure. The floating platform was then towed a short distance to its ultimate site, where regulation of the ballast allowed the structure to assume a vertical position on the ocean floor. (See Appendix 2, infra)
After the platform was in final position, a steam hammer drove “erection” piles through four interior legs of the structure to a depth of 114 feet below the sea bed. The buoyancy tanks were then removed and a total of 24 “primary” piles each *187 measuring 60 inches in diameter were driven through 65 inch wide pile sleeves around each of the four corner legs of the structure (6 primary piles to each leg) to a depth of 110 feet below the sea bed. The soil within each of primary piles was then drilled out and a total of 24 “insert” piles approximately 48 inches in diameter which were then lowered into the primary piles to a depth 380 feet below the ocean floor. Each “annulus” or gap (between the hole in the sea bed and the insert pile, and between the primary pile and the pile sleeve) was then filled with “grout” or a liquid cement paste to make each series of piles a “unified member”. The above-surface drilling and production modules were then installed on the platform permanently affixed to the sea bed.
In deposition, Michael Barry Green, an engineer formerly associated with McDer-mott in offshore design and construction, characterized the drilling platform as a “large, fixed platform” that was never intended to be moved from its present location. Green testified that the sole useful purpose of the buoyancy and ballasting system of the platform was in the initial positioning of the structure at the location where it would remain for its entire useful life of 20-25 years. He noted that the control panel for regulating the ballast on the structure had been removed very soon after the pile installation started and that the ballasting and venting system in the legs of the platform have probably become corroded. Although he acknowledged, “as a concept”, that the structure could be disconnected from the sea bed, refloated and moved to another location, he testified that such removal would be extremely unlikely because of the corrosion problems and a configuration that probably would not suit different water depths at a new location. To his knowledge, there has never been a removal of such a large platform in the North Sea, and he estimated that it would cost in excess of $100,000,000 to remove the platform at the end of its operating life.
R. Stagg, the engineer in charge of structural design of the platform, likewise testified in deposition that this fixed platform permanently attached to the sea bed is not from reuseable at another site from an economic standpoint. He stated that removal of the platform would require it to be severed at or below the sea bed with explosive charges or, more expensively, some type of milling device. Thereafter “massive amounts” of buoyancy would have to be attached to the platform or it would have to be blasted into pieces so that it could be handled by offshore lifting equipment. According to Stagg, even if the platform could be blown “to bits”, put on a barge and refloated elsewhere, it would have to be reassembled at a location that was approximately the same depth with substantially equivalent bottom conditions, and with a process plant of similar weight and configuration as the previous one. He testified that the likelihood of doing so would be “virtually nil”. Stagg stated that the platform had only remained floating for a matter of hours when it was first installed and that it was not designed to include bilge pumps, mooring lines or navigation lights. The only lights on the platform are those required for hazardous navigation or helicopter landings.
The evidence considered, we find no error in the trial judge’s granting of the exceptions of prescription based on an implicit conclusion that the platform is not a “vessel” within the meaning of the Jones Act and the federal maritime law. Applying the jurisprudential rules cited earlier, we conclude this facility was constructed as a permanently fixed, stationary drilling platform designed to remain in one location for its entire useful life. Although the structure did in fact float above the surface of the water briefly during its initial installation, it has since been attached permanently to the sea bed through an intricate configuration of steel piles driven 380 feet below the ocean floor. At the time of plaintiffs accident, the structure was fully installed and functioning as a stationary rig platform. Removal of the platform from its present location would involve considerable expense and would, in the final *188 analysis, constitute a controlled “demolition” by explosive charges rather than a simple refloating to a new site. The “[m]ere flotation on water does not constitute a structure a ‘vessel’.... ” Cook v. Belden Concrete Products, Inc., 472 F.2d 999 (5th Cir.1973); Blanchard v. Engine & Gas Compressor Serv., 575 F.2d 1140 (5th Cir.1978).
We distinguish Hicks v. Ocean and Drilling Exploration Company, supra. The special purpose structure found to be a “vessel” in Hicks was a submersible oil storage facility known as the “Round Barge” consisting of cylindrical oil storage tanks attached to a platform on conventional pilings at the bottom of the Gulf of Mexico. Although it was designed for the place where it was located, it could be raised for maintenance and repair, and consideration had been given to moving it to a different location. Refloating of the Round Barge could be accomplished by disconnecting cat walks and flow lines from its platform and pumping out water ballast.
Accordingly, we hold the trial judge properly maintained the exceptions of prescription filed by all defendants. Because of our holding, we find no necessity to address any issues concerning the granting of summary judgment in favor of J. Ray McDermott Company, Inc. and the other defendants involved in the design and construction of the platform.
Accordingly, the judgment is affirmed.
AFFIRMED.
*189 APPENDIX I

*190 APPENDIX II