**CARGILL FERTILIZER, INC.**

v.

**PEARL JAHN O/B, et al.**

No. CIV.A. 00–1143.

United States District Court,
E.D. Louisiana.

Feb. 21, 2002.

John Francis Fay, Jr., Walter P. Maestri, Deutsch, Kerrigan & Stiles, New Orleans, LA, for Plaintiff.

Robert Taylor Lemon, II, Ruth Brewer Schuster, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FALLON, District Judge.

## I. PROCEDURAL HISTORY

Cargill Fertilizer, Inc. sued O/B PEARL JAHN and D/B ANITA T, in rem, and Gulfcoast Transit Company, Electro–Coal Transfer Corporation, Associated Terminals, Inc. Associated Marine Equipment, L.L.C., and SGS Commercial Testing & Engineering Company, in personam, for damages resulting from the contamination of a cargo of monocalcium phosphate ("monocal").[1] Defendants deny liability and assert that if any damage occurred, it was due to the actions of others including Cargill. Defendant GulfCoast and Electro–Coal counterclaim against Cargill for indemnity and reimbursement of all costs, expenses, attorneys fees, and interest incurred by GulfCoast resulting from this action pursuant to the Phosphate Transportation and Transfer Agreement and the Contract of Affreightment entered into by the parties.

This case came on for trial before the Court without a jury. The trial commenced on November 28, 2001 and concluded on the same date.

The Court, having carefully considered the testimony of all the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes, in whole or in part, a finding of fact, the Court adopts it as such.

## II. FINDINGS OF FACT

Plaintiff Cargill Fertilizer, Inc. ("Cargill") was the owner of 3,000 tons of monocalcium phosphate ("monocal") which was loaded aboard the ocean-going barge PEARL JAHN (in addition to other cargos) at Cargill's East Tampa Fertilizer Facility in Tampa, Florida on April 9 and 10, 1999. Monocal is used as a livestock feed supplement.

Defendant GulfCoast Transit ("GulfCoast") is the owner and operator of the ocean going barge PEARL JAHN. GulfCoast contracted with the Plaintiff to ship the monocal from Cargill's loading facility in Tampa, Florida to Davant, Louisiana onboard the PEARL JAHN. At Davant the monocal was to be transferred from the PEARL JAHN to river barges and thereafter shipped by another company upriver to Plaintiff's warehouse facility in Dubuque, Illinois. Plaintiff contracted with Defendant Electro–Coal Transfer Corp. ("Electro–Coal") to transfer the monocal from the PEARL JAHN to the river barges at Electro–Coal's Davant transfer facility.

---

1. Prior to trial, Cargill settled its claim against Commercial Testing & Engineering Company.

On April 9, 1999 Cargill loaded the monocal into PEARL JAHN's number two hold while the vessel was dockside at Cargill's East Tampa Fertilizer Facility in Tampa, Florida. Prior to loading, Cargill hired SGS Commercial Testing & Engineering Company ("CT & E") to inspect the hold for cleanliness. CT & E certified that each of the PEARL JAHN cargo holds was clean and fit to received the intended cargo. After loading, the PEARL JAHN hatches were closed, sealed, and secured. Specifically, to ensure a good seal was maintained during transportation across the Gulf of Mexico, a foam sealant was used to seal the hatch covers to the hatch coamings, contact cement was applied to the edges of the hatch covers to further seal the hatches, the hatch covers and doors were taped down with duct tape, and finally the hatches were "dogged down" with U-bolts. The hatch cover seals were not broken until after the PEARL JAHN arrived at Electro–Coal's Davant facility.

Upon arrival at the Davant Facility, the PEARL JAHN was sent to a mid-stream anchorage. Electro–Coal hired the services of Defendants Associated Terminals, Inc. and Associated Marine Equipment, L.L.C. (collectively "Associated") to transfer the monocal from the PEARL JAHN to two river barges which were supplied by Cargill. Neither of the two river barges (CC–95554 and ING–5079) was owned or operated by any of the defendants. Associated dispatched its midstream cargo transfer rig ANITA T to Davant to transfer the PEARL JAHN cargo to the river barges.

At 0735 on April 14, 1999, the ANITA T arrived alongside the PEARL JAHN. At 0830 the ANITA T commenced discharge operations, directly transferring the PEARL JAHN's cargo to the river barges. The transfer of the monocal began at 1345 on April 14 and continued to 0515 on April 15. The ANITA T utilized a clamshell bucket to transfer the monocal. The entire monocal cargo in hold number two was transferred to the two river barges. Prior to transferring the monocal to the river barges, CT & E inspected the cargo holds of the river barges and certified them clean. River barge CC–95554 received the first half of the cargo and river barge ING–5079 received the second half. ING–5079 shifted alongside ANITA T at 2240 on April 14. The presence of rain in the area delayed commencement of discharge to ING–5079 until 0115 on April 15. In connection with the "rounding up" [2] of the monocal cargo in PEARL JAHN hold number two, the ANITA T lowered a front-end loader into the hold at 0255 on April 15. The ANITA T also lowered a Bobcat sweeper, supplied by Electro–Coal, into the hold at 0425 on April 15.

A Bobcat sweeper is a small Bobcat tractor outfitted with an optional sweeper attachment on the front end. In this case, the sweeper attachment consists of a 72 inch wide circular broom and a 16.1 cubic foot sweep collection box, the contents of which can be dumped by the Bobcat tractor by simply elevating and tilting the box.

ING–5079 completed loading at 0515 on April 15 and departed the Electro–Coal facility on that day. ING–5079 was moved to the International Marine Terminals ("IMT") facility at Myrtle Grove, Louisiana, across and two miles upriver from the Electro–Coal Terminal. ING–5079 departed the IMT facility in a twenty-eight barge tow on April 19 and arrived at the

---

**2.** Rounding-up refers to the final stage of offloading of bulk cargo when because of the small amount of bulk cargo remaining in the hold, it is necessary to use pushing or sweeping equipment, such as front-end loaders and sweepers, to collect the bottom layer of cargo into a pile so that the clam-shell bucket can take the final scoops of cargo.

East Dubuque Fleeting Facility on May 9. CC–95554 departed the Electro–Coal facility on April 18 and arrived at the East Dubuque Fleeting Facility on May 6. The two rivers barges loaded with monocal were towed to East Dubuque in separate tows.

The transfer of the monocal cargo from the barges to Cargill's shore-based warehouse did not begin until June 13. Between the time of their arrival in East Dubuque and June 13, the two barges remained in a fleet near the IEI Barge Services Terminal in East Dubuque. Cargill held the monocal in the barges during this time because Cargill's warehouse space was not available to receive the monocal cargo. The barges were moved to IEI's offloading facility on June 13 for discharge of the monocal by an IEI crane operator.

The CC–95554 completed discharging to Cargill's warehouse on June 14. No problems were observed with the monocal from this barge. IEI began discharging the ING–5079 monocal on June 15 and required two days to complete the transfer. During the discharge of ING–5079 on June 15, IEI's crane operator, Mike Donovan, who was performing the discharge, did not observe any problems with the monocal while transferring the cargo by means of a clamshell bucket. However, at the end of the day Donovan inspected the grating which serves as a screen over the cargo receiving hopper, and observed a short piece of chain and a pair of safety glasses. At this point two-thirds of the original contents of ING–5079 had already been offloaded. On the next morning Donovan resumed discharge of the ING–5079 monocal cargo. That morning, with the first scoop of monocal from the ING–5079, Donovan observed a piece of chain link caught in the bucket. After the chain was removed, Donovan resumed the discharge. About one hour after he had observed the

chain dangling from the clamshell bucket, Donovan checked the grate over the hopper and observed "chunks of metal" caught by the grate. Donovan gathered up the chunks and reported the problem to Sarah Schneider, Cargill's Dubuque facility supervisor. Donovan and Schneider inspected the monocal cargo that remained to be discharged and found metal chunks at the top of the last pile of monocal on the rake end of the barge.

After discovering the contamination in the barge, Donovan and the IEI Terminal Manager, Dave Marshall, inspected the monocal piles in the Cargill warehouse. Using a magnet they found iron particles in the piles of monocal in the warehouse. In an attempt to screen the contaminants from the monocal, Cargill hired a salvage company to set up a screening magnet and sieve to clean the monocal. Approximately 1800 tons of the contaminated monocal cargo was run through the screening machine and some magnetic contaminants were removed. However, the process was only partially successful in purifying the monocal. As a result, Cargill realized a loss when it was forced to sell the contaminated monocal for a lower price as fertilizer rather than its intended use as a feed supplement.

The mass of the contaminants separated from the monocal through the salvage operation was never ascertained. However, a spectrographic chemical analysis of the contaminants was conducted by experts for both Cargill and Electro–Coal.

Cargill alleges that Electro–Coal's Bobcat sweeper, which was lowered into the PEARL JAHN hold during the rounding-up phase of discharge, was the source of the contamination. Prior to its transfer to the ANITA T during the PEARL JAHN offload, the sweeper had been kept aboard Electro–Coal's floating crane, ELECTRO–22. The evidence suggests that the Bob-

cat sweeper was kept aboard the ELEC-TRO–22 for a ten-day period prior to the PEARL JAHN offload, during which time the ELECTRO–22 assisted in the discharge of seven different ships which involved the transfer of cargoes of hot briquetted iron ("HBI"), pig iron, phosphate, coal, and iron ore pellets. Further, for the ten-day period prior to the sweeper being delivered to the PEARL JAHN, the ELECTRO 22 log contains numerous references to tractors (term also used for sweeper) being placed into the cargo holds of ships handling either HBI, pig iron, coal, or iron ore pellets.

## III.  CONCLUSIONS OF LAW

A.  *Cargill's Negligence Claim against Gulfcoast, Electro–Coal, and Associated for Damage to Cargo*

■ The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333. The general maritime law is the substantive law applicable to this case.

In a claim for damage to cargo caused by the negligent acts of a non-carrier, the plaintiff has the burden of establishing: (1) that the defendant had a duty to guard against the damage caused; (2) that the defendant breached that duty by engaging in conduct that fell below the applicable standard of care; (3) that the negligent conduct was a cause in fact as well as the proximate cause of the damage; and (4) that there was actual loss, injury, or damage suffered by the plaintiff. Thomas Schoenbaum, 1 Admiralty & the General Maritime Law § 5–2, at 170.

Applying this standard, the Court concludes that the plaintiff has not met his burden of establishing the source of the contamination and, therefore, is unable to establish that any negligent acts by either Electro–Coal, Gulfcoast, or Associated proximately caused the contamination of the monocal cargo.

First, there is direct evidence that the Bobcat sweeper was clean at the moment before it was lowered into the PEARL JAHN cargo hold. Associated's employee, Chad Victoriana, assigned as flagman onboard the ANITA T during the PEARL JAHN offload, testified that he thoroughly inspected the sweeper prior to lowering it into PEARL JAHN's number two hold. Victoriana testified that he personally checked the sweeper bristles and as well as the collection box. Specifically, Victoriana testified that he looked inside the collection box with a flashlight and saw nothing.

Considering the quantity of material that would have to have been held in the sweeper's collection box to so thoroughly contaminate the monocal as in this case, Victoriana certainly would have seen something in the collection box were it actually present.

Victoriana also testified that he observed an Electro–Coal employee operate the Bobcat sweeper while it was on the deck of the ANITA T prior to it being lowered into the PEARL JAHN hold. Victoriana stated that when the operator dumped the collection box, nothing came out.

Secondly, the evidence suggests that any residual cargo collected by the sweeper while in the PEARL JAHN was not dumped into the river barge. Rather, the sweepings were removed from the PEARL JAHN hold with the clamshell bucket and the sweepings dumped on the deck of the ANITA T and eventually washed or swept overboard into the river. In this way, even if the Bobcat sweeper was lowered into the PEARL JAHN with a collection box full of HBI, coal, and pig iron sweepings from prior jobs, these materials would have been discarded into the river and would not have found there way into the river barge.

Finally, plaintiff argues that considering the presence of such a variety of contaminants found in the monocal, the only possible single source of such a variety of materials is the Elctro–Coal facility at Davant. Plaintiff supports this argument with evidence that the metallic contaminants found in the monocal were of the same composition as the cargos handled at the Electro–Coal facility in the days prior to the PEARL JAHN offload. However, this argument is weakened by the unexplained presence of safety glasses and links of chain which also found their way into the monocal placed in ING–5079. It is entirely possible if not likely that the contaminants came from several sources and that the Electro–Coal facility is not the only possible source.

For the foregoing reasons, the Court concludes that plaintiff Cargill has failed to carry its burden of proving that it is more likely than not that the monocal cargo was contaminated by the negligent acts of any of the defendants.

*B.  Counterclaims of Gulfcoast and Electro–Coal for Full and Complete Reimbursement of All Costs, Expenses, Attorneys Fees and Interest Incurred as a Result of These Proceedings*

█ Counter-claimants Gulfcoast and Electro–Coal seek reimbursement from Cargill for all costs, expenses, attorneys fees and interest incurred by counter-claimants in this proceeding. Counter-claimants argue that because they have not been found liable of negligence in this case, they are entitled to the reimbursement sought pursuant to Article 7(B) of the Phosphate Transportation and Transfer Agreement ("Phosphate Agreement") and Article 11(b) and (e) of the Contract of Affreightment.[3]

Article 7(B) of the Phosphate Agreement provides that "[Cargill] agrees to hold harmless [Electro–Coal] and/or any party performing services or supplying barges or towboats from all claims for damage to cargo and/or loss of cargo or weight loss, and furnish a complete waiver of subrogation by [Cargill] and their underwriters regarding claims for damage and/or loss of cargo or weight loss except as provided in Article 4(B)(2)."

Article 4(B)(2) provides that "[Electro–Coal] shall not be responsible for loss of, damage to, or destruction os any phosphate in its care, custody or control, whether in transfer process or elsewhere, except to the extent that it fails to use ordinary care."

Article 11(b) of the Contract of Affreightment provides that "[Cargill] agrees that it will insure under an 'all risk' policy, the cargo laden in Gulfcoast's vessels to the full market value of the policy shall contain the following provisions:  (i) a waiver of subrogation against Gulfcoast and/or its subcontractors...including Electro–Coal Transfer Corporation...except in instances of negligence of Gulfcoast, its affiliates, agents, directors, employees, officers or subcontractors, or the failure to use ordinary care...."

Finally Article 11(e) provides that "[e]xcept in instances of negligence of Gulcoast, its affiliate agents, directors, employees, officers or subcontractors, [Cargill] shall indemnify and hold Gulfcoast harmless for any damage or loss to the cargo."

█ Under federal maritime law, a contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, but it should not be read to impose liability

---

**3.**  The terms and conditions of both the Phosphate Transportation and Transfer Agreement and the Contract of Affreightment have been stipulated to by the parties.

for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir.1981). The contract should be read as whole, and a court should not look beyond the written language of the contract to determine the intent of the parties unless the disputed language is ambiguous. *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984); *Corbitt*, 654 F.2d at 332–33; *Hicks v. Ocean Drilling & Exploration Co.*, 512 F.2d 817, 825 (5th Cir.1975), *cert. denied sub nom. H.B. Buster Hughes, Inc. v. Ocean Drilling & Exploration Co.*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976). Put simply, indemnity agreements are to be strictly construed. *Randall v. Chevron U.S.A., Inc.*, 13 F.3d 888, 906 (5th Cir.1994), *modified on other grounds on denial of rehearing by* 22 F.3d 568 (5th Cir.1994).

The courts of the Fifth Circuit have often held that the duty to indemnify and hold harmless includes costs and attorney's fees. *See Lirette v. Popich Bros. Water Transport, Inc.*, 699 F.2d 725, 728, n. 11 (5th Cir.1983). However, this rule of contract interpretation has developed exclusively in the context of a defendant who claims indemnity from a third party pursuant to a contract between the defendant and the third party. In this case it is the defendant who seeks indemnification from the unsuccessful plaintiff. In this regard the defendants seeks an order contrary to the general rule that parties each bear their own costs of litigation.

Based on the Court's reading of the contractual language giving rise to the defendants' claim for attorney fees, costs and expenses in this litigation, the payment of such fees and costs as is requested in this case was not contemplated by the parties when they executed the contracts. It stretches the imagination to believe that it was the intent of the parties that Cargill would have to pay the defendants' litigation costs should it fail in establishing the negligence of the defendants. Such a result would have a chilling effect on legitimate litigation and should be discouraged. Accordingly, Cargill is not responsible for the reimbursement of attorneys fees and costs of litigation incurred by the defendants in this case.

## IV. CONCLUSION

For the foregoing reasons, IT IS ORDERED that judgment be entered for the defendants, each party to bear their own costs.